UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CAPITOL RECORDS, LLC, a Delaware Corporation; CAROLINE RECORDS, INC., a New York Corporation; VIRGIN RECORDS AMERICA, INC., a California Corporation; EMI BLACKWOOD MUSIC, INC., a Connecticut Corporation; EMI APRIL MUSIC, INC., a Connecticut Corporation; EMI FULL KEEL MUSIC, INC., a duly licensed Corporation; EMI VIRGIN MUSIC, INC., a New York Corporation; EMI ROBBINS CATALOG, INC., a New York Corporation; EMI WATERFORD MUSIC, INC., a California Corporation; EMI GROVE PARK MUSIC, INC., a California Corporation; COLGEMS-EMI MUSIC, INC., a Delaware Corporation; and EMI VIRGIN SONGS, INC., a New York Corporation<br><br>       Plaintiffs,<br><br>    v.<br><br>VIDEOEGG, INC. d/b/a VIDEOEGG.COM, a Delaware corporation; HI5 NETWORKS, INC. d/b/a HI5.COM; and DOES 1-10, inclusive<br><br>       Defendants. | CASE NO. 08 CV 5831<br><br><br>**OPPOSITION OF PLAINTIFFS TO MOTION TO DISMISS, OR, ALTERNATIVELY, TO TRANSFER VENUE OF DEFENDANT Hi5 NETWORKS, INC.** |

## **TABLE OF CONTENTS**

**Page**

INTRODUCTION ........................................................................................................... 1

I.    STATEMENT OF FACTS ..................................................................................... 3

II.   THE LEGAL STANDARD .................................................................................... 8

III.  PLAINTIFFS HAVE MADE A *PRIMA FACIE* SHOWING OF
      JURISDICTION. ..................................................................................................... 9

      A.    Hi5 "Transacts Business" And Contracts To Supply Services In
            New York. ..................................................................................................... 9

      B.    Hi5 Caused Harm, And Should Have Known That Its Conduct
            Would Cause Harm, In New York. ..................................................... 14

      C.    Asserting Jurisdiction Over Hi5 Would Not Offend Due Process. ........................ 18

IV.   IN THE ALTERNATIVE, PLAINTIFFS ARE ENTITLED TO LIMITED
      DISCOVERY ON THE ISSUE OF PERSONAL JURISDICTION. ................................. 20

V.    Hi5 HAS NOT MET ITS HEAVY BURDEN OF PROVING THAT
      TRANSFER IS APPROPRIATE. .......................................................................... 21

Conclusion ................................................................................................................ 25

i

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

A&M Records, Inc. v. Napster, Inc.,
    239 F.3d 1004 (9th Cir. 2001) ............................................................... 1, 13, 16

Ahava Food Corp. v. Donnelly,
    2002 WL 31757449 (S.D.N.Y. Dec. 9, 2002) .................................... 15

Anderson v. Canarail, Inc.,
    2005 WL 2454072 (S.D.N.Y. Oct. 6, 2005) ...................................... 18

Banco Ambrosiano, S.P.A. v. Artoc Bank & Trust Ltd.,
    62 N.Y.2d 65, 464 N.E.2d 432, 476 N.Y.S.2d 64 (N.Y. 1984) ......... 18

BMG Music v. Gonzalez,
    430 F.3d 888 (7th Cir. 2005) ............................................................ 16

Capitol Records, Inc. v. Naxos of Am., Inc.,
    4 N.Y.3d 540, 830 N.E.2d 250, 797 N.Y.S.2d 352 (N.Y. 2005) ....... 24

Carroll v. Kahn,
    68 U.S.P.Q. 2d 1357 (N.D.N.Y. 2003) ........................................ 14, 15

Citigroup Inc. v. City Holding Co.,
    97 F. Supp. 2d 549 (S.D.N.Y. 2000) ...................................... 8, 9, 10

Coleman v. ESPN, Inc.,
    764 F. Supp. 290 (S.D.N.Y. 1991) .................................................. 11

Columbia Pictures Television v. Krypton Broad. of Birmingham, Inc.,
    106 F.3d 284 (9th Cir. 1997) .......................................................... 17

Conn. Nat'l Bank v. OMI Corp.,
    687 F. Supp. 111 (S.D.N.Y. 1988) .............................................. 21, 25

CutCo Indus., Inc. v. Naughton,
    806 F.2d 361 (2d Cir. 1986) ............................................................ 8, 9

Design Tex Group, Inc. v. U.S. Vinyl Mfg. Corp.,
    2005 WL 357125 (S.D.N.Y. Feb. 14, 2005) ............................. 8, 14, 24

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

Duncan v. Nu-Life, Inc.,
    1998 WL 66002 (S.D.N.Y. Feb. 17, 1998) ....................................................... 15

Editorial Musical Latino Americana, S.A. v. Mar Int'l Records, Inc.,
    829 F. Supp. 62 (S.D.N.Y. 1993) ..................................................................... 11

Factors Etc., Inc. v. Pro Arts, Inc.,
    579 F.2d 215 (2d Cir. 1978) ............................................................................ 23

Freeplay Music, Inc. v. Cox Radio, Inc.,
    2005 WL 1500896 (S.D.N.Y. June 23, 2005) ........................................... 12, 16

Gardipee v. Petroleum Helicopters, Inc.,
    49 F. Supp. 2d 929 (E.D. Tex. 1999)............................................................... 23

Gulf Oil Corp. v. Gilbert,
    330 U.S. 501 (1947) ........................................................................................ 21

Kwik Goal, Ltd. v. Youth Sports Publ'g Inc.,
    2006 WL 1489199 (S.D.N.Y. May 3, 2006) ................................................... 24

M. Shanken Comm., Inc. v. Cigar500.com,
    2008 WL 2696168 (S.D.N.Y. July 7, 2008)................................................. 9, 19

Mattel Inc. v. Procount Bus. Servs.,
    2004 WL 502190 (S.D.N.Y. March 10, 2004)........................................... 10, 11

McGraw-Hill Cos., Inc. v. Ingenium Techs. Corp.,
    375 F. Supp. 2d 252 (S.D.N.Y. 2005) ....................................................... 14, 16

Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.,
    243 F. Supp. 2d 1073 (C.D. Cal. 2003).................................................. 1, 15, 19

Mohamed v. Mazda Motor Corp.,
    90 F. Supp. 2d 757 (E.D. Tex. 2000).............................................................. 23

Nat'l Football League v. Miller,
    2000 WL 335566 (S.D.N.Y. March 30, 2000)....................................... 14, 18, 20

## TABLE OF AUTHORITIES
### (continued)

Page(s)

Olan Mills Inc. v. Linn Photo Co.,
    23 F.3d 1345 (8th Cir. 1994) .......................................................................... 10

Perfect 10, Inc. v. Google, Inc.,
    416 F. Supp. 2d 828 (C.D. Cal. 2006), aff'd in part, rev'd in part, 508 F.3d
    1146 (9th Cir. 2007) ....................................................................................... 13

Philip Morris USA, Inc. v. Veles Ltd.,
    2007 WL 725412 (S.D.N.Y. March 12, 2007) .................................................. 9

Pitbull Prods., Inc. v. Universal Netmedia, Inc.,
    2008 WL 1700196 (S.D.N.Y. April 4, 2008) ............................................ 12, 20

Plunket v. Doyle,
    2001 WL 175252 (S.D.N.Y. Feb. 22, 2001) ................................................... 15

ProCD, Inc. v. Zeidenberg,
    86 F.3d 1447 (7th Cir.1996) ........................................................................... 13

RCA Records v. All-Fast Sys., Inc.,
    594 F. Supp. 335 (S.D.N.Y. 1984) .................................................................. 11

Realuyo v. Villa Abrille,
    2003 WL 21537754 (S.D.N.Y. July 8, 2003) .................................................. 12

Stephan v. Babysport, LLC,
    499 F. Supp. 2d 279 (E.D.N.Y. 2007) ............................................................ 18

Strategem Dev. Corp. v. Heron Int'l N.V.,
    153 F.R.D. 535 (S.D.N.Y. 1994) .................................................................... 20

Subafilms, Ltd. v. MGM-Pathe Comm. Co.,
    24 F.3d 1088 (9th Cir. 1994) .......................................................................... 16

Sunshine Cellular v. Vanguard Cellular Systems, Inc.,
    810 F. Supp. 486 (S.D.N.Y. 1992) ............................................................ 22, 23

Televisa, S.A. de C.V. v. Koch Lorber Films,
    382 F. Supp. 2d 631 (S.D.N.Y. 2005) ............................................................ 25

## TABLE OF AUTHORITIES
### (continued)

Page(s)

Texas Int'l Magnetics, Inc. v. BASF Aktiengesellschaft,
    31 Fed. Appx. 738 (2d Cir. March 12, 2002) ................................................................. 20

Toy Biz, Inc. v. Centuri Corp.,
    990 F. Supp. 328 (S.D.N.Y. 1998) ................................................................. 21, 22, 24

Turbana Corp. v. M/V "Summer Meadows",
    2003 WL 22852742 (S.D.N.Y. Dec. 2, 2003) ................................................................. 20

Twentieth Century Fox Film Corp. v. iCraveTV,
    2000 WL 255989 ................................................................................................. 16

Van Dusen v. Barrack,
    376 U.S. 612 (1964) ................................................................................................. 22

Warner Bros. Entm't, Inc. v. Ideal World Direct,
    516 F. Supp. 2d 261 (S.D.N.Y. 2007) ......................................................... 8, 10, 11, 20

World Wide Volkswagen Corp. v. Woodson,
    444 U.S. 286 (1980) ................................................................................................. 19

## STATUTES

17 U.S.C. § 101 ................................................................................................................. 10

28 U.S.C. § 1400(a) ......................................................................................................... 21

C.P.L.R. 301 ..................................................................................................................... 8

C.P.L.R. 302 ....................................................................................... 8, 9, 15, 16, 18

## INTRODUCTION

Hi5's motion disingenuously re-characterizes the nature of its website and deliberately skirts the numerous facts and allegations that justify the exercise of personal jurisdiction by this Court. Far from a passive, foreign website, Hi5 is a commercial venture whose entire business, as well as the entire content of its website, is based upon the interaction between its users and its website. ***Hundreds of thousands*** of these users, including users who uploaded and viewed infringing content, are located in New York. Like the services at issue in <u>A&M Records, Inc. v. Napster, Inc.</u>, 239 F.3d 1004, 1023 (9th Cir. 2001), and <u>Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.</u>, 243 F. Supp. 2d 1073, 1088 (C.D. Cal. 2003), Hi5 has built its business, and its 80-million-person membership base, on the massive, viral infringement and dissemination of video files embodying Plaintiffs' musical compositions and sound recordings. Hi5 not only has enabled and induced its users, including users in New York, to copy and upload infringing music videos to its website, but it also has facilitated and induced the global dissemination and ongoing infringement of these music videos by indexing them for easy access (including by keywords containing the names of Plaintiffs' songs or artists), transmitting them to users around the world (including in New York), and encouraging its users to "share" videos via e-mail or embedded links. Hi5 engaged in these activities knowing that Plaintiffs' copyrights were being infringed. Yet Hi5 did nothing to stop or curtail that infringement, content to grow its userbase and generate revenue from advertising fed to users drawn to infringing content.

That Hi5's activities are directed at New York residents and/or cause significant harm in New York cannot be disputed:

- Hi5 maintains a significant membership base (tens of thousands of users) in the State of New York. In fact, ***Hi5 has touted New York as one of its "top cities"***

1

and has pitched its service directly to residents of New York. These users, in turn, attract other New York users through New York-based "groups." Each of Hi5's New York members has contracted with Hi5 (and entered into licenses with Hi5), including by consenting to Hi5's "Terms of Service."

- Among the infringing content that Hi5 has made available to its visitors are videos that were uploaded by users located in New York. Once uploaded, these videos were transmitted (i.e. publicly performed) by Hi5 *thousands of times*.

- Each of the infringing works was actually transmitted to users in New York, including to Plaintiffs and their investigators located in New York.

- Hi5's copying, distribution, and public performance of infringing videos caused significant damage to Plaintiffs, which are headquartered and own copyrights in New York. Hi5 was aware (or should have been aware) of the content of those videos, as well as that its service was being used to upload and share infringing music, and that Plaintiffs are located in New York.

Hi5 thus both "transacts business" in New York and knowingly causes injury to Plaintiffs in New York. The exercise of jurisdiction is appropriate under New York law and proper under the Due Process clause.

Because personal jurisdiction is appropriate in New York, venue also is proper. Hi5's argument that for purposes of "convenience," the case should be transferred to the Northern District of California ignores the facts and the law. Because Plaintiffs are headquartered in New York, transfer would merely shift any inconveniences from Hi5 to Plaintiff. In any event, there is no dispute that Hi5 has entered into contracts and does business in New York; its documents (most of which are electronic) can be easily transported; witnesses are present in New York and the testimony of any witnesses in California can be made available; it has the financial wherewithal to litigate here; and the national law firm it hired (with offices in New York and California) is fully capable of litigating this case in New York. Finally, while Hi5 argues that discovery from its co-defendant, VideoEgg, will be critical, it ignores that VideoEgg has

2

*consented* to jurisdiction in New York (and has answered the Complaint); thus, transfer would create inefficiency and a risk of inconsistent rulings.

## I.    STATEMENT OF FACTS

**The EMI Plaintiffs.** Plaintiffs are three record companies and ten music publishers which collectively own copyrights (or related rights) in sound recordings and musical compositions, including some of the most popular sound recordings and musical compositions in the world. Complaint, ¶ 1. All of the Plaintiffs are organized or have a principal place of business in New York, New York. Declaration of Michael Abitbol ("Abitbol Decl."), ¶ 3; Declaration of Alasdair McMullan ("McMullan Decl."), ¶¶ 3- 5.

**Hi5's Significant New York Presence.** Hi5 is a privately held, for-profit company that owns and operates, through its website Hi5.com, "one of the world's largest social networks." Hi5 boasts more than "80+ million registered users in over 200 nations," and "nearly 50 million unique monthly users." Declaration of Marc E. Mayer ("Mayer Decl."), Ex. 8. Hi5's suggestion that it does not direct its service at New York users is wrong. Hi5 not only has a substantial user base (in the hundreds of thousands) in New York, but has touted New York and Brooklyn as among its "*top cities*," and solicited users in "New York" and "Brooklyn" by placing these cities' names in huge, bold letters on its home page (larger than the font used for other major cities). Id., Ex. 1. Hi5 offered links to lists of users in these "top cities," which reflected at least *320,000* users in or around New York City, and *290,000* in Brooklyn.[1] Id., Ex. 2. Hi5 hosts dozens of

---

[1] Additionally, a search of Hi5's user database by zip code revealed that *at least* 140,000 users are located within 5 miles of the zip code 11378 (Queens), 6,900 are within 5 miles of the zip code 12260 (Albany), 3,700 are within 25 miles of zip code 14850 (Ithaca), 3,800 are within 25

(…continued)

discussion or social "groups" centered around New York or users in New York. Id., Ex. 6. These groups collectively claim thousands of members.

Hi5 admits (cryptically) that it has "entered into contracts with companies based in New York," (Yalamanchi Aff., ¶ 17), but has not identified the nature of those contracts.[2]  At least one of these contracts was with Hi5's partner (and co-defendant) VideoEgg, which has offices and a "big presence" in New York. Mayer Decl., Ex. 14 & 15; Complaint, ¶¶ 30, 37.  Pursuant to the VideoEgg partnership, VideoEgg supplied Hi5 with all of its video-related technology (including the "player" software that enabled users to upload and share videos) and related services, such as the storage of user-uploaded videos, the screening of these videos for inappropriate or infringing content, and the insertion of advertising into videos.  Complaint, ¶¶ 31, 32.  These VideoEgg services enabled the infringements at issue. Id., ¶¶ 33, 38.

**Hi5's Business Model.**  Hi5 offers free memberships to its website and online services. Complaint, ¶ 37.  To create a membership account, a user enters his or her name, e-mail address, birthdate, and password, and then (by "clicking") agrees and consents to Hi5's "Terms of Service." Id.; see also Mayer Decl., Ex. 7 (Terms of Service).  Once a user creates a membership account for Hi5, the user then may engage in a variety of activities, including creating a personal or "group" webpage and uploading digital media files, including video files, to Hi5. Id.  Videos

---

(...continued)

miles of zip code 14601 (Rochester), and 8,100 are within 25 miles of zip code 13421 (Oneida). Mayer Decl., Ex. 3.

[2]  The facts set forth herein are based on the allegations of the Complaint and the declarations submitted herewith.  Following their receipt of Hi5's motion, Plaintiffs contacted Hi5 to request that it stipulate to jurisdictional discovery.  Hi5 refused.  Plaintiffs believe that the facts set forth herein fully justify the exercise of jurisdiction by this Court.  However, to the extent the Court

(...continued)

4

uploaded to Hi5 are stored either on Hi5's servers or on servers owned and controlled by VideoEgg. Id., ¶ 38. Once uploaded, Hi5 users may view those videos (via a streaming transmission) or share them with others, either by "grabbing" the video "code" or e-mailing a link to the videos. Id.

Hi5 profits from the sale of advertising that it displays on its website, both to members and other visitors. Complaint, ¶ 25; Yalamanchi Aff., ¶ 3. While visiting Hi5 (and viewing infringing videos) users are shown a variety of advertisements, including "banner" advertisements displayed on webpages and "rich media" (i.e. video) or other advertisements that are played while a video is being performed. Id., ¶¶ 40, 41. In its own words, Hi5's "broad reach and ad-serving platform allows us to provide marketing solutions for global brands as well as national and *regional* advertisers." Mayer Decl., Ex. 9 (emphasis added). Through its use of "IP and profile-based demographic targeting," users accessing the website (including from New York) receive advertisements for local services that are specifically directed at local residents, as well as national advertisements targeted to their demographic. Id. Hi5 admits that some advertising displayed on the website was for entities in New York. Yalamanchi Aff., ¶ 16.[3]

There is a direct relationship between Hi5's advertising revenue and the number of visitors to Hi5: the larger Hi5's user and membership base, the more attractive Hi5 is for advertisers, the more Hi5 can charge for those advertisements, and the more revenue Hi5 collects

---

(…continued)

believes that additional factual development would aid determination of this motion, Plaintiffs request leave to conduct brief jurisdictional discovery.

[3] Hi5 has not specified how it profits from advertising. Like many similar websites, Hi5 likely uses both a "pay-per-impression" model (advertisers pay based on the number of times the

(…continued)

from "click-throughs" or page views. Complaint, ¶ 41. Hi5 specifically profits from the availability of infringing content, as such content draws users, who then view or click on advertisements (including while viewing infringing videos). Id. As Hi5's Chief Technology Officer stated: "We make money off paid advertising, and that advertising is based on how many users it reaches." Mayer Decl., Ex. 10. Hi5 has recognized that the ability to access "the hottest new tunes or raciest new video" is a key component of its business model. Id.

**Hi5's Infringement of EMI's Copyrights.** In an investigation conducted in New York in late 2007 and early 2008, Plaintiffs discovered that hundreds of their sound recordings and musical compositions had been uploaded to Hi5 and were being copied, publicly performed, and distributed by Hi5 and thousands of its users. Abitbol Decl., ¶ 6; McMullan Decl., ¶ 8. At issue in this action are more than 147 sound recordings and 101 musical compositions, as well as 13 sound recordings that were fixed prior to 1972 (and thus are subject to the protection of New York state law). McMullan Decl., Ex. 1; Abitbol Decl., Ex. 1. These infringements represent only a small portion of the overall number of Plaintiffs' works that Plaintiffs suspect have been infringed by Hi5 and/or its users. Based on available information, at least three of these videos were uploaded to Hi5 by *members located in New York*, after which they collectively were viewed *thousands of times* by visitors to Hi5 (some of whom likely reside in New York), as well as by Plaintiffs in their New York offices. Mayer Decl., Exs. 4 & 5; McMullan Decl., ¶ 10 & Ex. 2; Abitbol Decl., ¶ 8 & Ex. 2. These videos also likely were shared (via links sent by e-mail or embedded into other websites) thousands of times by Hi5 users. Complaint, ¶ 38.

---

(…continued)

advertisement appears) and a "pay-per-click" model (advertisers pay whenever a user "clicks" on

(…continued)

6

Hi5 knows or has reason to know that content on its website infringes Plaintiffs' copyrights. All of the videos at issue are readily identifiable, including by their title, their content, and keywords used to identify them, as containing Plaintiffs' works. See, e.g., Mayer Decl., Ex. 12. Many contain works that are extremely well-known as Plaintiffs', and that Hi5 should know have not been authorized for free distribution by its users (e.g., recordings by The Beatles, Coldplay; compositions by James Blunt, Beyonce). Id.; Complaint, ¶¶ 3, 42. These frequently are identifiable simply by looking at the index that Hi5 prepares (and by looking at the videos themselves). See, e.g., Mayer Decl., Exs. 4, 5 & 12. Hi5 encourages its users to view and share music videos on its website, and facilitates, participates in, and induces its users to engage in the unauthorized reproduction, adaptation, public display, and public performance of videos containing Plaintiffs' copyrighted works. Complaint, ¶ 3. Hi5 offers a special "channel" devoted to music videos, offers tools that enable the rapid and easy sharing of those videos, denotes and indexes videos with "tags," and, while one video is playing, suggests other "related" videos (many of which also are infringing). Complaint, ¶¶ 39, 40.[4]

**This Lawsuit.** On June 26, 2008, EMI filed this lawsuit against Hi5 and VideoEgg, alleging that by the foregoing conduct, Hi5 and VideoEgg had engaged in acts of direct, contributory, and vicarious copyright infringement. Additionally, EMI alleged violations of New York common law misappropriation and unfair competition arising from the unauthorized use of

---

(...continued)
the advertisement). Mayer Decl., Exs. 11, 16.

[4] EMI conducted a pre-filing investigation, but after this lawsuit was filed, Hi5 attempted to remove the infringing content, and appears to have removed all video functionality. However, Hi5 engaged in this activity for several years, using infringing videos to help build its user base.

7

sound recordings fixed prior to 1972. Complaint, ¶¶ 92-106. VideoEgg answered the Complaint and consented to jurisdiction. VideoEgg Answer, ¶ 6.

## II.    THE LEGAL STANDARD

In order to establish personal jurisdiction over Hi5, EMI must establish jurisdiction under New York's "long-arm" statute (C.P.L.R. 301, 302) and the constitutional due process standard. Citigroup Inc. v. City Holding Co., 97 F. Supp. 2d 549, 564 (S.D.N.Y. 2000). Where, as here, "the defendant is content to challenge only the sufficiency of the plaintiff's factual allegations, in effect demurring by filing a Rule 12(b)(2) motion … the plaintiff need persuade the court only that its factual allegations constitute a *prima facie* showing of jurisdiction." Warner Bros. Entm't, Inc. v. Ideal World Direct, 516 F. Supp. 2d 261, 265 (S.D.N.Y. 2007). To make that showing, the plaintiff may rely on the complaint, affidavits, and other supporting evidence. Id. On a motion to dismiss, all of these documents "are construed in the light most favorable to plaintiff and all doubts are resolved in its favor." CutCo Indus., Inc. v. Naughton ("Cutco"), 806 F.2d 361, 365 (2d Cir. 1986). See also Design Tex Group, Inc. v. U.S. Vinyl Mfg. Corp., 2005 WL 357125, *1 n.1 (S.D.N.Y. Feb. 14, 2005).

There are at least two bases for the exercise of "specific" personal jurisdiction over Hi5. First, C.P.L.R. 302(a)(1) provides long-arm jurisdiction over any entity who "transacts *any* business within the state or contracts anywhere to supply goods or services in the state," and the claim arises from that activity. (Emphasis added). Second, C.P.L.R. 302(a)(3)(ii) provides for the exercise of personal jurisdiction over an out-of-state defendant who commits a tortious act outside of the state that causes injury to "persons or property within the state," if the defendant "expects or should reasonably expect the act to have consequences in the state and derives

8

substantial revenue from interstate or international commerce." Plaintiffs have established far more than the *prima facie* showing required at this stage to establish jurisdiction under either of these two prongs, as well as under the Due Process clause of the United States Constitution.

## III.    PLAINTIFFS HAVE MADE A *PRIMA FACIE* SHOWING OF JURISDICTION.

### A.    Hi5 "Transacts Business" And Contracts To Supply Services In New York.

"A nondomiciliary transacts business under C.P.L.R. 302(a)(1) when he purposefully avails himself of the privilege of conducting activities within [New York], thus invoking the benefits and protections of its laws." CutCo, 806 F.2d at 365 (citation omitted). "[T]ransacting business requires only a minimal quantity of activity, provided that it is of the right nature and quality." Philip Morris USA, Inc. v. Veles Ltd., 2007 WL 725412, *4 (S.D.N.Y. March 12, 2007) (citation omitted). Even "[a] *single transaction* may suffice for personal jurisdiction under Section 302(a)(1), and physical presence by the defendant in the forum state during the activity is not necessary." Id. (emphasis added). Nor is it necessary that the defendant (including a website defendant) specifically "targeted" consumers of New York. M. Shanken Comm., Inc. v. Cigar500.com, 2008 WL 2696168, *5 (S.D.N.Y. July 7, 2008).

As Hi5 acknowledges, this Court has recognized a "spectrum of cases" involving a defendant's use of the Internet. "At one end are cases where the defendant makes information available on what is essentially a 'passive' website." Citigroup Inc., 97 F. Supp. 2d at 565. At the other end are highly interactive websites that "knowingly and repeatedly transmit[] computer files to customers in other states." Id. "Finally, occupying the middle ground are cases in which the defendant maintains an interactive web site which permits the exchange of information between users in another state and the defendant, which depending on the level and nature of the exchange may be a basis for jurisdiction." Id.

9

Hi5 apparently concedes that its website, which permits (and encourages and facilitates)
users to locate, upload, and disseminate content, including infringing videos; create personal or
group profiles and webpages; exchange e-mail or text messages; create "favorites" and "friends"
lists; and engage in a host of other social activities, is not "passive," nor analogous to an
"advertisement in a nationally-available magazine or newspaper." Citigroup Inc., 97 F. Supp. 2d
at 565. Hi5's website is highly interactive, and falls at the upper end of the scale. In addition to
fostering and touting its massive New York user base (Mayer Decl., Exs. 1, 2), Hi5 has *actually
transmitted* the infringing videos at issue *thousands of times* to visitors to the website and in so
doing publicly performed the works embodied therein. See 17 U.S.C. § 101 (definition of
"public performance"). The videos were transmitted to EMI itself in New York. McMullan
Decl., ¶ 8; Abitbol Decl., ¶ 6; Mattel Inc. v. Procount Bus. Servs., 2004 WL 502190, *2
(S.D.N.Y. March 10, 2004) (jurisdiction where defendant shipped merchandise ordered by
plaintiff's investigator: "The fact that this sale was to Mattel's investigator is irrelevant.
Personal jurisdiction is proper as Defendants solicited sales over the internet, accepted an order
from a resident of this state, and shipped goods into this state to fill the order.") See also Olan
Mills Inc. v. Linn Photo Co., 23 F.3d 1345, 13478 (8th Cir. 1994) (defendant infringed by
copying works for plaintiff's agent). Hi5 also offered the videos for transmission, distribution,
and public display to *all* of its users, including the hundreds of thousands of users located in New
York. Hi5 did so with knowledge or reason to know that the videos were infringing, and in order
to profit from the availability of infringing material. Complaint, ¶¶ 41-43. This plainly
constitutes the type of "knowing[] and repeated[]" transmission of content that is sufficient for
jurisdiction under the statute. See Ideal World, 516 F. Supp. 2d at 266 ("Ideal World Direct

10

operates Flix.net and IShareIt.com, which transmit files to customers in exchange for membership fees. This activity places them in the class of websites that 'knowingly and repeatedly transmit[] computer files to customers in other states.'"). See Editorial Musical Latino Americana, S.A. v. Mar Int'l Records, Inc., 829 F. Supp. 62, 64 (S.D.N.Y. 1993) ("Offering one copy of an infringing work for sale in [the forum], *even if there is no actual sale*, constitutes commission of a tortious act within the state sufficient to imbue this Court with personal jurisdiction over the infringers.") (emphasis added).[5]

The case for jurisdiction over Hi5 is even more compelling than in Ideal World and Mattel because at least three (and likely more) of the specific infringements at issue were copied and uploaded *by New York users*. These particular videos then were copied by Hi5, indexed so as to make them easy to locate, and then transmitted (i.e., publicly performed) over *ten thousand times*, each of which was a separate act of infringement. See, e.g., Coleman v. ESPN, Inc., 764 F. Supp. 290, 294 (S.D.N.Y. 1991) (transmission of videos violated performance right in musical compositions therein). These infringing videos played a critical role in Hi5's overall business plan: Hi5 facilitated, enabled, and encouraged these New York users to upload (i.e., copy) these infringing videos. Then, by indexing the infringing videos, placing them into a "music" subfolder or destination, publicly performing them, and making them able to be viewed

---

[5] At this stage, and without discovery, it is impossible for Plaintiffs to know precisely how many times the infringing videos were viewed by New York residents. That number is irrelevant for purposes of the jurisdictional analysis, because "even a single New York business transaction may be sufficient." Ideal World, 516 F. Supp. 2d at 266. Moreover, based on the above facts it may be *inferred* that other New York users, like Plaintiffs, received transmissions of infringing videos. See RCA Records v. All-Fast Sys., Inc., 594 F. Supp. 335, 338 (S.D.N.Y. 1984) (evidence of distribution to plaintiff's agent establishes a "strong inference" that the defendant would engage in same conduct for others "unconnected with plaintiffs").

11

and virally disseminated to millions of users, Hi5 used them to lure additional visitors to visit the website, become members, and post additional infringing content. Complaint, ¶¶ 2, 3, 37-43. All the while, Hi5 profited from that activity by pairing infringing content with specific advertisements that it selected and collecting revenue every time one of those advertisements was viewed or clicked through. Id.

These facts set this case apart from the largely or entirely passive websites in the cases cited by Hi5, none of which had any relevant connection with New York. In Realuyo v. Villa Abrille, 2003 WL 21537754, *5-7 (S.D.N.Y. July 8, 2003), the defendant was a paradigmatic "magazine"-type website (namely, a news reporting site), in which there was "no interaction between readers and the defendant." Freeplay Music, Inc. v. Cox Radio, Inc., 2005 WL 1500896, *7 (S.D.N.Y. June 23, 2005), involved an equally passive website, whose sole interactive feature was that users could initiate the transmission of a radio "simulcast" that passed through the website. In Pitbull Prods., Inc. v. Universal Netmedia, Inc., 2008 WL 1700196, *6 (S.D.N.Y. April 4, 2008), the website consisted entirely of a message board and "blog," and the plaintiff attempted to base jurisdiction *solely* on the fact that one posting (of out-of-state origin) on the website was accessible in New York. Most critically, there was no evidence in any of these cases that *any* of the allegedly material at issue was uploaded by, viewed, or transmitted to any New York resident. (All of the material at issue in Realuyo and Freeplay Music Inc. was provided by the foreign defendant, and the websites did not offer users the ability to submit and disseminate content).

Hi5's argument that despite its hundreds of thousands of New York users, its claim that New York is one of its "top cities," and the fact that infringing content was uploaded by and

12

transmitted to some of those users (and available to all of them), it cannot be subject to jurisdiction because it does "sell merchandise" or "charge fees" (Motion at 9) cannot withstand scrutiny. Hi5 is a for-profit, commercial enterprise that earns revenue both from the sale of advertising and from its users' interaction with that advertising. Contrary to Hi5's assertion (Motion at 9), its advertising is directly related to the claims and damages alleged in the Complaint, because Hi5 receives a direct financial benefit from the number of New York users it attracts, from the uploading of infringing material posted by these New York users on the website, and from the viewing of infringing material by its users around the world. Users viewing infringing content are exposed to, and click on, infringing advertisements, generating revenue for Hi5. Perfect 10, Inc. v. Google, Inc., 416 F. Supp. 2d 828, 857 (C.D. Cal. 2006) (direct financial benefit when advertisements served on websites containing infringing images and users visit those websites), aff'd in part, rev'd in part, 508 F.3d 1146 (9th Cir. 2007). In addition, the draw in Hi5's userbase created by the availability of infringing content increases the overall value of the website and the value of advertising. Napster, 239 F.3d at 1023 ("Napster's future revenue is directly dependent upon increases in userbase. More users register with the Napster system as the quality and quantity of available music increases.")

Finally, even if its transactions in New York were deemed insufficient to constitute "transacting business" within New York, Hi5 cannot contest that it has **contracted** with its thousands of New York users to provide services within New York. At the time they created a membership account, each New York member specifically consented to be bound by Hi5's "Terms of Service," which is a binding contractual agreement between the parties. See ProCD, Inc. v. Zeidenberg, 86 F.3d 1447, 1451 (7th Cir.1996). The terms of service also granted to Hi5

13

"an irrevocable, perpetual, non-exclusive, royalty-free ... worldwide *license* to reproduce, distribute, publicly display and perform (including by means of a digital audio transmission)" all content (including infringing content) provided by Hi5's New York users. Mayer Decl., Ex. 7 (¶ 6). In exchange, Hi5 agreed to provide to its New York members the "social networking" services offered by the website, including e-mail addresses, personal webpages, and the ability to copy, perform, and disseminate photographs, videos, and other media. Id.

### B. Hi5 Caused Harm, And Should Have Known That Its Conduct Would Cause Harm, In New York.

Hi5's conduct – i.e. copying, adapting, and publicly performing Plaintiffs' sound recordings and musical compositions, and facilitating and contributing to the copying, adaptation and public performance of these works by its users – indisputably causes injury to Plaintiffs and their property within New York, which is "where the allegedly infringed intellectual property is held." McGraw-Hill Cos., Inc. v. Ingenium Techs. Corp., 375 F. Supp. 2d 252, 256 (S.D.N.Y. 2005). See also Nat'l Football League v. Miller, 2000 WL 335566, *2 (S.D.N.Y. March 30, 2000) ("[B]y linking the NFL's trademarks to gambling activity, the defendant causes damage to the NFL in New York."). In other words, "because the plaintiffs (and their intellectual property) are based in New York, the injury is felt within the state *no matter where the infringement takes place*." Design Tex Group, Inc., 2005 WL 357125, * 1 (emphasis added).

The few cases cited by Hi5 (which it relies on to argue that "economic loss" alone is not an injury within New York) are inapposite. This is not a case generally involving "remote or consequential injuries such as lost commercial *profits* which occur in New York *only because* the plaintiff is domiciled or doing business here." Carroll v. Kahn, 68 U.S.P.Q. 2d 1357, 1359-60 (N.D.N.Y. 2003) (emphasis added). Plaintiffs' copyrights are owned, licensed and exploited

14

in New York. These copyrights were injured (and their value diminished) by Hi5's massive, continuous, and willful infringement of them via its website, which is accessible by millions of users throughout the world, including by hundreds of thousands of users in New York. <u>See</u> <u>Grokster</u>, 243 F. Supp. 2d at 1088 ("[J]urisdiction typically is appropriate where a foreign defendant engages in significant infringement of a resident's intellectual property, and knows where the harm from that infringement is likely to be suffered."). That is far different from the remote and isolated acts engaged in by the defendants in the cases cited by Hi5 – none of which involved the Internet or the transmission of infringing computer files. <u>See, e.g., Carroll</u>, 68 U.S.P.Q. at 1360 (one showing of allegedly infringing film in California); <u>Duncan v. Nu-Life, Inc.</u>, 1998 WL 66002, *6 (S.D.N.Y. Feb. 17, 1998) (improper filing of lawsuit in Illinois); <u>Plunket v. Doyle</u>, 2001 WL 175252, *3 (S.D.N.Y. Feb. 22, 2001) (defendant in Washington entered into unauthorized license agreement with a California-based company); <u>Ahava Food Corp. v. Donnelly</u>, 2002 WL 31757449, *3 (S.D.N.Y. Dec. 9, 2002) (defendant contacted plaintiff's customers by telephone.)[6]

Hi5's reading of C.P.L.R. 302(a)(3) to preclude jurisdiction unless the infringement itself occurs within the State of New York is untenable, including because it reads the first clause ("commits a tortious act *without the state*") out of the statute. It also makes no sense given the separate statutory provision (302(a)(2)) that governs tortious acts that take place "within" New

---

[6] Additionally, <u>Duncan</u> and <u>Ahava</u> involved ordinary commercial torts (not claims of copyright infringement), and thus have no bearing on (and certainly cannot contradict) the well-settled rule in this Circuit that copyright infringement harm is suffered where the copyright is owned. <u>Carroll</u> and <u>Plunket</u>, though they involved copyrights, are easily distinguishable on their face. <u>Carroll</u> involved a film that was shown only once, out-of-state, and the plaintiff in <u>Plunket</u> was not the copyright owner, but simply claimed certain rights to administer and license the works.

15

York. But even if Hi5's overly narrow interpretation is applied, jurisdiction is appropriate because, among other things, Hi5's users copied, distributed, and publicly performed Plaintiffs' works in New York. A&M Records, Inc. v. Napster, Inc., 239 F.3d 1004, 1014 (9th Cir. 2001) (Napster users "violate plaintiffs' distribution rights" by uploading file names to the Napster search index); BMG Music v. Gonzalez, 430 F.3d 888, 889 (7th Cir. 2005) ("[P]eople who post or download music files are primary infringers."); Twentieth Century Fox Film Corp. v. iCraveTV, 2000 WL 255989, * 7 (W.D. Pa. Feb. 8, 2000) ("Defendants [engage in unlawful public performances] by transmitting (through use of 'streaming' technology) performances of the works to the public by means of …the Internet."). By causing, materially contributing to, inducing, or failing to exercise its right to control these acts of direct infringement, Hi5 has committed acts of contributory or vicarious infringement in New York. Complaint, ¶¶ 58-91.[7] Cf. Subafilms, Ltd. v. MGM-Pathe Comm. Co., 24 F.3d 1088, 1093 (9th Cir. 1994) (contributory infringement claims governed by the law of the place where the direct infringement occurred).[8]

The subsidiary requirements of C.P.L.R. 302(a)(3)(ii) also are met here. Hi5 does not (and cannot) contest that it derives "substantial revenue from interstate or international commerce." Hi5's claim that Plaintiffs have not sufficiently alleged that Hi5 could "reasonably expect [its conduct] to have consequences in the state" is wrong. This Court, and others, routinely have held that a website engaged in the transmission of infringing files may reasonably expect that its activities would have consequences where the owner of the intellectual property is

---

[7] These facts also set this case apart from Freeplay, 2005 WL 1500896, *8. There, the unlicensed use of plaintiff's work took place entirely outside New York, and there was no evidence or allegation that the infringing broadcasts ever were received in New York.

16

located. McGraw-Hill Cos., Inc., 375 F. Supp. 2d at 256 ("It is reasonably foreseeable that the provision of materials that infringe the copyrights and trademarks of a New York company will have consequences in New York.")

Moreover, both the allegations and the undisputed evidence provide sufficient basis to conclude that Hi5 reasonably could have expected that its infringing conduct would cause harm to Plaintiff's New York copyrights or related rights. Among other things, Plaintiffs alleged that that Hi5 "permits, encourages, facilitates, and induces the uploading of thousands of videos" (Complaint, ¶ 25); "knows or has reason to know" (for a variety of reasons) that the videos it or its users copy and distribute contain Plaintiffs' works (Complaint, ¶ 42); with knowledge, materially contributed, induced, or caused user's infringement (Complaint, ¶ 60); and that all such actions were willful, "in disregard of and with indifference to the rights of [Plaintiffs]" (Complaint, ¶ 62). These allegations are more than sufficient to support the exercise of jurisdiction. See Columbia Pictures Television v. Krypton Broad. of Birmingham, Inc., 106 F.3d 284, 289 (9th Cir. 1997) ("[Plaintiff] alleged, and the district court found, that [defendant] willfully infringed copyrights owned by [plaintiff], which, as [defendant] knew, had its principal place of business in the Central District [of California].").

In addition to the foregoing, undisputed facts confirm that Hi5 knew or should have known that it or its users were engaging in the copying and public performance of infringing works (including those of Plaintiffs), and thereby expected or should have expected that such activities would cause harm to Plaintiffs and their copyrights in New York. Among other things,

(...continued)

[8] For this reason, jurisdiction under C.P.L.R. 302(a)(2) also would be appropriate, although the
(...continued)

17

Hi5 is well aware that many of its users are music fans and were using the site to upload and share musical recordings. Rreview of Hi5's website reveals hundreds of "groups" dedicated to Plaintiffs' artists such as Radiohead, Coldplay, and the Beatles. Mayer Decl., Ex. 13. Hi5 also certainly should have recognized that it might be sued by Plaintiffs in New York (the hub of the music industry) based on its own index, which directed users to infringing music videos and was loaded with keywords that specifically referenced Plaintiffs' best known artists. Mayer Decl., Ex. 12; see Nat'l Football League, 2000 WL 335566, *2 ("In establishing a web site targeting NFL fans, Defendant had to recognize that, since there are two major NFL teams that some people still refer to as the New York Jets and New York Giants ... it was likely that his site would ultimately appear on thousands of computer screens in New York ... [and] he could do significant damage to the image of the NFL ... in New York."); Stephan v. Babysport, LLC, 499 F. Supp. 2d 279, 289 (E.D.N.Y. 2007) (inquiring whether a reasonable person would have expected harm in the state). And Hi5 was well aware of the value of copyrights, reserving in its Terms of Service its *own* rights under copyright as against its users, and requiring these users to consent to jurisdiction in its home state of California. Mayer Decl., Ex. 7 (¶¶ 15, 19).

### C.    Asserting Jurisdiction Over Hi5 Would Not Offend Due Process.

C.P.L.R. 302 does not extend New York's long-arm jurisdiction to the full extent of constitutional limits. Banco Ambrosiano, S.P.A. v. Artoc Bank & Trust Ltd., 62 N.Y.2d 65, 71, 464 N.E.2d 432, 435, 476 N.Y.S.2d 64, 66 (N.Y. 1984) ("Importantly, in setting forth certain categories of bases for long-arm jurisdiction, CPLR 302 does not go as far as is constitutionally

---

(...continued)
Court need not reach the issue to deny Hi5's motion.

1926065.6/37182-00012

permissible."). Thus, "[o]rdinarily, 'if jurisdiction is proper under the CPLR, due process will be satisfied because CPLR § 302 does not reach as far as the constitution permits.'" Anderson v. Canarail, Inc., 2005 WL 2454072, *3 (S.D.N.Y. Oct. 6, 2005) (Baer, J.).

Contrary to Hi5's assertion that none of its activities has been directed at New York, as set forth above, the claims at issue here arise from numerous substantial and purposeful contacts with New York, including (a) soliciting membership from and thereafter contracting (and entering into license agreements) with hundreds of thousands of members located in New York, and rateing New York City as among its "top cities;" (b) encouraging, inducing, and providing material support to New York members to upload infringing content to its website; (c) transmitting infringing content to New York residents, and making such transmissions available for millions of others located in New York (including its thousands of New York members); (d) knowingly facilitating the further copying, dissemination, and public performance of videos uploaded from New York containing Plaintiffs' copyrights; and (e) causing harm to Plaintiffs in New York, with knowledge that Plaintiffs were the owners of copyrights or related rights in the material contained on its website. These contacts are more than sufficient to have caused Hi5 to reasonably foresee that its actions might subject it to jurisdiction in New York. World Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297 (1980) ("purposeful availment" determines whether a "defendant's conduct and connection with the forum state are such that he should reasonably anticipate being haled into court there."); Grokster, 243 F. Supp. 2d at 1091-92 (defendant that facilitated transmission of infringing files had "'fair warning that the particular activity may subject [it] to the jurisdiction of a foreign sovereign.'"); Shanken, 2008 WL 2696168 at *9 (jurisdiction appropriate because defendants "chose to use this New York-

19

based company's intellectual property" and "New York has a substantial interest in protecting

the intellectual property rights of copyright ... holders.")  Moreover, since Hi5 plainly profits

from its New York activities, including through the advertising revenue generated and the gains

in overall value from its substantial New York membership and the infringing videos uploaded

by those members, it cannot now claim that due process is offended by requiring it to defend its

conduct here.  See Nat'l Football League, 2000 WL 335566 at *2 ("Since he apparently profits

substantially from the activity that does damage to the plaintiffs in New York, it does not offend

due process to require him to defend his actions in a New York courtroom.").

## IV.    IN THE ALTERNATIVE, PLAINTIFFS ARE ENTITLED TO LIMITED DISCOVERY ON THE ISSUE OF PERSONAL JURISDICTION.

Plaintiffs have established a *prima facie* case for personal jurisdiction over Hi5.

However, if this Court believes additional facts would assist determination, Plaintiffs should be

permitted to conduct limited, targeted jurisdictional discovery.  See Strategem Dev. Corp. v.

Heron Int'l N.V., 153 F.R.D. 535, 547-48 (S.D.N.Y. 1994) (allowing jurisdictional discovery

since the plaintiffs had "made a sufficient" start towards establishing that jurisdiction existed);

Turbana Corp. v. M/V "Summer Meadows", 2003 WL 22852742, at *2 (S.D.N.Y. Dec. 2, 2003)

(Baer, J.) (jurisdictional discovery allowed when it "would serve to fill any holes in [plaintiff's

jurisdictional] showing ...."). The Second Circuit has held it is an abuse of discretion to deny

jurisdictional discovery when plaintiffs have proffered specific but "insufficiently developed,"

jurisdictional allegations.  Texas Int'l Magnetics, Inc. v. BASF Aktiengesellschaft, 31 Fed.

Appx. 738, 739 (2d Cir. March 12, 2002).  Jurisdictional discovery was specifically permitted in

the cases cited by Hi5 to support its motion.  See, e.g., Pitbull, 2008 WL 1700196 at *3

(discovery on the issue of "substantial revenue"); Ideal World, 516 F. Supp. at 267 ("Plaintiffs

20

have conducted jurisdictional discovery and amended their complaint twice.") Through

jurisdictional discovery (specifically, one deposition and a brief, narrow set of interrogatories

and document requests), Plaintiffs would seek to learn, *inter alia*, the following:

- The nature and content of each of Hi5's contracts with New York businesses, and the amount of revenue that Hi5 derives from them.

- The nature and extent of advertising on Hi5's website that specifically is targeted at users in New York, and the amount of revenue that Hi5 derives from them.

- The number and identity of New York businesses that advertise on Hi5's website, and the amount of revenue that Hi5 derives from them.

- The amount of revenue that Hi5 derives from advertisers located outside of California, and from advertisers who target users located outside of California.

- The number of Hi5 users located in New York who uploaded, viewed, and shared the infringing content at issue in this litigation, and the amount of advertising revenue that Hi5 derived from their infringing uses.

- Whether VideoEgg hosts any of the infringing content on servers in New York.

## V.    Hi5 HAS NOT MET ITS HEAVY BURDEN OF PROVING THAT TRANSFER IS APPROPRIATE.

Hi5 agrees that the venue analysis under 28 U.S.C. § 1400(a) is co-extensive with the

jurisdictional analysis. Thus if Hi5 is subject to jurisdiction in New York, the case properly is

venued here. Moreover, "unless the balance is strongly in favor of the defendant, the plaintiff's

choice of forum should rarely be disturbed." Gulf Oil Corp. v. Gilbert, 330 U.S. 501, 508

(1947). This is especially true where, as here, Plaintiffs have sued in the forum where they (and

where all of their witnesses and documents) are headquartered and located. Toy Biz, Inc. v.

Centuri Corp., 990 F. Supp. 328, 330 (S.D.N.Y. 1998) ("The plaintiff's choice of forum is to be

given substantial weight and should not be disturbed unless the balance of convenience and

justice weigh heavily in favor of defendant's proposed forum, especially where, as here,

21

plaintiff's chosen forum is its principal place of business.") Far from a "clear and convincing showing that the balance of convenience weighs heavily in favor of the transferee court," Conn. Nat'l Bank v. OMI Corp., 687 F. Supp. 111, 113 (S.D.N.Y. 1988), Hi5's argument is merely that transfer to the Northern District of California would be more convenient for *Hi5*. That is not a reason for transfer. "There is nothing … in the language or policy of §1404(a) to justify its use by defendants to defeat the advantages accruing to plaintiffs who have chosen a forum which, although it was inconvenient, was a proper venue." Van Dusen v. Barrack, 376 U.S. 612, 633-34 (1964). Review of the transfer factors further confirms that transfer is inappropriate:

**Convenience of Parties and Location of Witnesses and Evidence.** Hi5's argument that key witnesses are not located in the forum district is wrong. All (or almost all) of Plaintiffs' witnesses – including on its ownership and administration of the copyrights at issue, its damages from the alleged infringement, and the investigation into Plaintiffs' infringement – are located in or around New York. Abitbol Decl., ¶ 4; McMullan Decl., ¶ 6. The same is true with respect to Plaintiffs' documents and other evidence or business records. Abitbol Decl., ¶¶ 5, 7; McMullan Decl., ¶¶ 7, 9. By contrast, none of Plaintiffs' witnesses or evidence are located in the Northern District of California. Id. Thus, all that would be accomplished by transfer would be a shifting of inconvenience from Hi5 to Plaintiffs. Sunshine Cellular v. Vanguard Cellular Systems, Inc., 810 F. Supp. 486, 501 (S.D.N.Y. 1992) ("A § 1404(a) motion should not be granted if all transfer would accomplish is to shift the inconveniences from one side to the other"); Toy Biz, 990 F. Supp. at 331 (same).[9] As for Hi5's witnesses, Plaintiffs are prepared to take the depositions in

_____

[9] Hi5's claim that the Plaintiffs are *registered* to do business in California is irrelevant. There is no dispute that (with the exception of plaintiff Capitol Records), none of the Plaintiffs has its

(…continued)

22

California, if necessary, of any witnesses who do not regularly travel to New York. <u>Sunshine</u>, 810 F. Supp. at 500. Hi5's and VideoEgg's employees (which Hi5 concedes are the key witnesses) are under their control and can be brought here without compulsory process. <u>Gardipee v. Petroleum Helicopters, Inc.</u>, 49 F. Supp. 2d 929, 930 & n.5 (E.D. Tex. 1999) ("Defendants' prospective [employee] witnesses ... while not residing within one hundred miles of this courthouse, are nevertheless subject to the control of the Defendant, and can effectively be brought here without compulsory process.").

  Hi5's argument that its "documents, records, and electronic storage material" are located in California (Motion at 20) also is entitled to little, if any, weight. "Access to documents and other proof is not a persuasive factor in favor of transfer without proof that documents are particularly bulky or difficult to transport, or proof that it is somehow a greater imposition for defendant to bring its evidence to New York than for plaintiff to bring its evidence to [the defendant's choice of forum]." <u>Sunshine</u>, 810 F. Supp. at 500. Hi5 also admits that much of its evidence will be in electronic format, which, of course, can be easily transported at nominal cost. <u>See</u> <u>Mohamed v. Mazda Motor Corp.</u>, 90 F. Supp. 2d 757, 778 (E.D. Tex. 2000) (location of documents is "given decreasing emphasis due to advances in ... information storage.").

  Finally, Hi5's argument concerning this Court's subpoena power is unpersuasive. Hi5 does not identify a single necessary third-party witness, much less one that is outside the subpoena power of this Court. Hi5's concerns about departing employees or dismissed

---

(...continued)
offices in California. Also irrelevant is Hi5's assertion that certain of the Plaintiffs have filed lawsuits in California. In each of the referenced lawsuits, Capitol and/or Virgin were just one (or two) of many (unaffiliated) record company plaintiffs.

defendants are hypothetical. <u>Factors Etc., Inc. v. Pro Arts, Inc.</u>, 579 F.2d 215, 218 (2d Cir. 1978) (party seeking transfer "must clearly specify the key witnesses to be called and must make a general statement of what their testimony will cover.").

**Locus of Operative Facts.** Plaintiff's infringement will involve proof not only of Hi5's activities, but also evidence of Plaintiff's ownership of the copyrights, its viewing and investigation in New York, and the harm to Plaintiffs. These facts arise from and are directly related to Plaintiffs' New York location. <u>See, e.g., Design Tex</u>, 2005 WL 357125, *1.[10]

**Familiarity With Applicable Law.** Plaintiffs have alleged violations not of only the Federal Copyright Act, but also for violations of New York common law with respect to Hi5's misappropriation of sound recordings fixed prior to 1972. <u>See Capitol Records, Inc. v. Naxos of Am., Inc.</u>, 4 N.Y.3d 540; 830 N.E.2d 250; 797 N.Y.S.2d 352 (N.Y. 2005). Even if, as Hi5 claims, a California court may apply New York law, this factor certainly does not favor transfer.

**Relative Means of the Parties.** "Although Courts can consider the relative means of the parties, this factor is not entitled to great weight where plaintiff and defendant are both corporations." <u>Toy Biz</u>, 990 F. Supp. at 331. Hi5 admits that it is not "financially unable to litigate in this forum." Motion at 21. And contrary to its disingenuous assertion that doing so "would be a substantial hardship," Hi5 is a company with substantial resources (including $20 million in venture capital financing, Mayer Decl., Ex. 8), touts itself as one of the largest social networks in the world (<u>Id.</u>), and has the financial wherewithal to retain a large national law firm

---

[10] Hi5's reliance on <u>Kwik Goal, Ltd. v. Youth Sports Publ'g Inc.</u>, 2006 WL 1489199 (S.D.N.Y. May 3, 2006), is misplaced. There, the plaintiff there was not a resident of New York and the case had no relevant connection with New York.

to defend this case. Moreover, since all counsel have offices in New York and California very little, if any, additional financial burden would be imposed by litigating in New York.

**Trial Efficiency and General Interests of Justice.** Finally, but perhaps most important, transfer is unwarranted because VideoEgg has appeared in this action and has not sought transfer. See, e.g., Conn. Nat'l Bank, 687 F. Supp. at 114 (denying motion to transfer where, among other factors, certain of the defendants submitted to New York jurisdiction). Hi5 concedes that "the design and function of the VideoEgg technology will be relevant and witnesses representing VideoEgg will likely be required to testify." Motion at 18. Thus, transfer of the claims against Hi5 would result in parallel proceedings, with overlapping discovery and potentially inconsistent rulings. E.g. Televisa, S.A. de C.V. v. Koch Lorber Films, 382 F. Supp. 2d 631, 634-35 (S.D.N.Y. 2005) (staying parallel action to avoid inefficiency and inconsistency).

<u>**Conclusion**</u>

For the foregoing reasons, Plaintiffs respectfully request that Hi5's motion be denied.

Dated: August 18, 2008                    MITCHELL SILBERBERG & KNUPP LLP
New York, New York

By: *Christine Lepera*
    _____
    Christine Lepera (CL 9311)
    12 East 49th Street, 30th Floor
    New York, New York 10017
    Telephone: (917) 546-7703
    Facsimile: (917) 546-7673

    Russell J. Frackman (*pro hac vice*)
    Marc E. Mayer (*pro hac vice*)
    11377 West Olympic Blvd.
    Los Angeles, CA 90064
    Telephone: (310) 312-2000
    Facsimile: (310) 312-3100

    *Attorneys for Plaintiffs*

25

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CAPITOL RECORDS, LLC, a Delaware Corporation; CAROLINE RECORDS, INC., a New York Corporation; VIRGIN RECORDS AMERICA, INC., a California Corporation; EMI BLACKWOOD MUSIC, INC., a Connecticut Corporation; EMI APRIL MUSIC, INC., a Connecticut Corporation; EMI FULL KEEL MUSIC, INC., a duly licensed Corporation; EMI VIRGIN MUSIC, INC., a New York Corporation; EMI ROBBINS CATALOG, INC., a New York Corporation; EMI WATERFORD MUSIC, INC., a California Corporation; EMI GROVE PARK MUSIC, INC., a California Corporation; COLGEMS-EMI MUSIC, INC., a Delaware Corporation; and EMI VIRGIN SONGS, INC., a New York Corporation | CASE NO. 08 CV 5831 |
| | **CERTIFICATE OF SERVICE** |
| Plaintiffs, | |
| v. | |
| VIDEOEGG, INC. d/b/a VIDEOEGG.COM, a Delaware corporation; HI5 NETWORKS, INC. d/b/a HI5.COM; and DOES 1-10, inclusive | |
| Defendants. | |

I, Jeffrey M. Movit, hereby certify that on August 18, 2008 the Opposition of Plaintiff to

Motion to Dismiss, or Alternatively, to Transfer Venue of Defendant Hi5 Networks, Inc.; and the

accompanying Declarations of Marc Mayer, Alasdair McMullan, and Michael Abitbol were filed

via CM/ECF, which will provide electronic copies and notification of filing to counsel of record

for defendants VideoEgg, Inc. and Hi5 Networks, Inc.

DATED: New York, New York
   August 18, 2008

MITCHELL SILBERBERG & KNUPP LLP

By: _____
  Jeffrey M. Movit (JM-6725)
  12 East 49th Street, 30th Floor
  New York, New York 10017-1028
  Telephone: (212) 509-3900
  Facsimile: (212) 509-7239

2

1918368.1