UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------x
CAPITOL RECORDS, LLC; CAROLINE RECORDS, :
INC.; VIRGIN RECORDS AMERICA, INC.        :
EMI BLACKWOOD MUSIC, INC.; EMI VIRGIN     :
MUSIC, INC.; EMI ROBBINS CATALOG, INC.; EMI :
WATERFORD MUSIC, INC. EMI GROVE PARK      :
MUSIC, INC.; COLGEMS-EMI MUSIC, INC.; AND :
EMI VIRGIN SONGS INC.,                    :
                                          :
                                          :       08 CV 5831 (HB)
                        Plaintiffs,       :
                                          :       OPINION & ORDER
              -against-                   :
                                          :
VIDEOEGG, INC.; HI5 NETWORKS, INC.; AND   :
DOES 1-10,                                :
                                          :
                        Defendants.       :
-----------------------------------------------------------------------x

Hon. HAROLD BAER, JR., District Judge:

The instant motion requires the Court to apply the unsettled rules of internet-based jurisdiction to an increasingly popular means of online interaction, the "social networking" website. Plaintiffs, three record companies and ten music publishers, bring this copyright infringement action against Defendants VideoEgg, Inc. ("VideoEgg") and Hi5 Networks, Inc. ("Hi5"). Hi5 moves to dismiss for lack of personal jurisdiction and improper venue and, in the alternative, to transfer of this action to the Northern District of California.[1] On January 16, 2009, the Court ordered discovery on the issue of personal jurisdiction. For the following reasons Hi5's motions to dismiss for lack of personal jurisdiction and improper venue are DENIED and its motion to transfer this action to the Northern District of California is GRANTED.

## FACTUAL BACKGROUND

Plaintiffs are major record companies and music publishers, most of which are based in New York City. (Decl. of Michael Abitbol, dated August 15, 2008 ("Abitbol Decl.") ¶3; Decl. of Alasdair McMullan, dated August 18, 2008 ("McMullan Decl.") ¶¶3-5). Hi5 is a privately held California corporation based in San Francisco that owns and operates the internet website

---

[1] Co-Defendant VideoEgg consented to jurisdiction in New York pursuant to a stand-still agreement with Plaintiffs. (11/5/08 Transcript of Oral Argument on Motion to Dismiss ("Tr.") at 22:1-5.) However, VideoEgg is based in California and contends that "everything that is pertinent to this case with respect to VideoEgg [is located] in California." *Id.* at 22:10-11.

www.hi5.com.  (Compl. ¶ 25.)  All of Hi5's approximately 105 employees work in San Francisco, and the website was created and is maintained on servers located in California. (Aff. of Ramu Yalamanchi, dated July 31, 2008 ("Yalamanchi Aff.") ¶ 4, 11.)  Hi5 does not maintain bank accounts, telephones, or an agent for service of process in New York, and it is not registered to do business in this state.  (*Id.* ¶¶ 5, 6, 8, 10.)

Hi5.com is a self-described "social networking site," where registered users may, in Hi5's words, "share photos, send messages . . . join discussion groups, explore music and videos, and more."  (Declaration of Marc E. Mayer, dated August 18, 2008 ("Mayer Decl.") Ex. 8.)  Hi5 claims to have "more than 80+ million registered users in over 200 nations" and "nearly 50 million unique monthly users."  (Mayer Decl. at Ex. 8.)  Registered users generate or upload most of the content available on the Hi5 website and interact with one another via the "social networking" features of the website.  (*Id.*; Compl. ¶37.)  Apart from making the website available to registered users, Hi5's interaction with users is generally limited to registration and provision of technical support.  (Yalamanchi Aff. ¶14.)  Hi5 does not advertise its website, but rather relies on word of mouth to increase its user base.  (*Id.* ¶ 15.)

This litigation concerns technology that allowed registered users to upload video files to the Hi5 website and, after such video files had been "indexed," to view videos uploaded by other users by means of a "streaming" transmission enabled by technology supplied by VideoEgg. (Compl. ¶ 38.)  This feature has been removed from the website.[2]  Plaintiffs allege that video functionality led to the illegal reproduction, performance and distribution of their copyrighted recordings and musical compositions, and on the basis of such allegations they sue Hi5 for direct, contributory, and vicarious copyright infringement. (Compl. ¶¶ 45, 60, 76.)

Hi5 generates income from the sale of advertising displayed to registered users as they engage in "social networking" on the Hi5 website.[3]  (Yalamanchi Aff. ¶ 3.)  Such advertisements take the form of "banner" advertisements, which are graphic advertisements displayed on web-pages together with content such as user profiles, group pages and, during the period of video

---

[2] In their opposition to the instant motion, Plaintiffs state that after this lawsuit was filed Hi5 "appears to have removed all video functionality" from its website.  (Pls.' Opp'n. 7, n.4.)  Hi5 contends that the video functionality was removed prior to the filing of this lawsuit.  (Supp. Aff. of Ramu Yalamanchi, dated August 28, 2008 ("Supp. Yalamanchi Aff.")  ¶3).

[3] Hi5 does not sell advertisements through its website.  (Yalamanchi Aff. ¶ 16.)  However, the website promotes itself as an advertising venue and provides contact information for advertising sales offices. (Mayer Decl. Ex. 9.)

functionality, video files.  (Compl. ¶ 41.)   Plaintiffs allege that Hi5 used VideoEgg's technology to "embed" advertisements into user-uploaded videos so that the advertisement would run after the video was displayed.  (Compl. ¶¶ 40, 41.)  Hi5 promotes its website as an effective advertising platform for "global brands as well as national and regional advertisers." (Mayer Decl. Ex. 9.)  Documents produced by Hi5 pursuant to this Court's Order for jurisdictional discovery confirm that Hi5 has the capability to target advertisements to registered users based on their geographic location or demographic profile and that Hi5 bases advertising rates on an advertiser's targeting requirements.

Hi5 has estimated that its website attracts several hundred thousand "unique" visitors from the New York metropolitan area each month.[4]  Hi5 confirms that New York is one of its larger domestic markets but points out that the majority of its users are located overseas.  (Defs.' Supp. Br. at 2 n.2.)  Documents produced by Hi5 show that users in the New York metropolitan area viewed enough advertisements in a single month to generate substantial monthly advertising revenue. Documents also show that Hi5 has received substantial advertising revenue from companies located in New York and that its advertising sales staff in San Francisco both communicated directly with potential advertisers in New York and expressed interest in advertising campaigns that targeted New York.

Plaintiffs have identified 254 videos files alleged to contain their copyrighted works, which videos were viewed hundreds of thousands of times, including by Plaintiffs in their New York offices.  At least four Hi5 users who self-identified as New York residents uploaded a minimum of five allegedly infringing videos.  Hi5 has not produced documents that reflect information about the other website users who viewed the allegedly infringing videos, and, in the documents it has produced, Hi5 has redacted information about users who commented on those videos.

## DISCUSSION

### I.  Personal Jurisdiction

#### A.  Legal Standard

Although the plaintiff ultimately "bears the burden of establishing jurisdiction over the defendant by a preponderance of the evidence, the plaintiff need only make a *prima facie* showing that jurisdiction exists prior to the holding of an evidentiary hearing." *Ball v.*

---

[4] Hi5's audience-estimate documents define "New York" to include portions of Connecticut, New Jersey, New York and Pennsylvania. (*See, e.g.,* Doc. No. H8757)

*Metallurgie Hoboken-Overpelt, S.A.,* 902 F.2d 194, 196 (2d. Cir.1990) (citing *Hoffritz for Cutlery, Inc. v. Amajac, Ltd.*, 763 F.2d 55, 57 (2d Cir 1985)).  The plaintiff's obligation varies, however, depending on whether the jurisdictional determination is made prior to or subsequent to discovery.  *Id.* at 197.  Whereas prior to discovery the plaintiff may meet its burden by merely pleading good faith allegations sufficient to establish jurisdiction, "[a]fter discovery, the plaintiff's *prima facie* showing … must include an averment of fact that, if credited by the trier, would suffice to establish jurisdiction over the defendant. *Id.*  That is, "[t]he *prima facie* showing must be factually supported."  *Id.*  In ruling on a motion to dismiss for lack of personal jurisdiction, pleadings and affidavits must be "construed in the light most favorable to plaintiff and all doubts are resolved in its favor." *CutCo Industries, Inc. v. Naughton*, 806 F.2d 361, 365 (2d Cir. 1986) (citing *Hoffritz,* 763 F.2d at 57).

      **B.**    **Applicable Law**

      The Copyright Act, 17 U.S.C. § 101 *et seq.*, does not provide for nationwide service of process and so the Court applies the forum state's personal jurisdiction rules to determine if it has personal jurisdiction over a non-domiciliary defendant such as Hi5.  *Fort Knox Music Inc. v. Baptiste*, 203 F.3d 193, 196 (2d Cir. 2000).  Plaintiffs do not contend that Hi5's "contacts with New York are so continuous and systematic that it is subject to the jurisdiction of courts in New York on a general jurisdiction theory." *Sole Resort, S.A. de C.V. v. Allure Resorts Management, LLC,* 450 F.3d 100, 103 (2d Cir. 2006) (citing *Helicopteros Nacionales de Columbia, S.A. v. Hall*, 466 U.S. 408, 415 (1984) (internal citation and quotation marks omitted).  Rather, Plaintiffs contend that two provisions of New York's long-arm statute, N.Y. C.P.L.R. §302(a)(1) and §302(a)(3)(ii), afford this Court specific jurisdiction over Hi5 in this case.  New York's long-arm statute does not coincide with the limits of the Due Process Clause, and thus a two-part inquiry is required:  first, the Court must determine if jurisdiction is proper under the New York statute, and, if jurisdiction is statutorily permissible, the Court will then turn to the constitutional inquiry. *Best Van Lines v. Walker*, 490 F.3d 239, 244 (2d Cir. 2007).

      **C.**    **New York Long-Arm Statute: Section 302(a)(1)**

      Under C.P.L.R. Section 302(a)(1), jurisdiction is proper over an out-of-state defendant who "transacts any business within the state [of New York]" when the cause of action "arises from" such acts.  To determine if this standard has been met, courts look to the totality defendant's "interactions with, and activities within, the state," and their relation to the matter

that gives rise to the law suit.  *D.H. Blair & Co., Inc. v. Gottdiener*, 462 F.3d 95, 105 (2d Cir. 2006); *PDK Labs, Inc. v. Friedlander*  103 F.3d 1105, 1109 (2d Cir. 1997).

    **1. Hi5 "Transacts Business" in New York**

    In construing the phrase "transacts business," the New York courts rely upon U.S. Supreme Court cases that articulate the constitutional limits of a state's power to assert personal jurisdiction over an out-of-state defendant.  *See, e.g.*, *Ehrenfeld v. Bin Mahfouz*, 9 N.Y.3d 501, 508 (2007).  Thus, "'[t]he overriding criterion' necessary to establish a transaction of business is 'some act by which the defendant purposefully avails itself of the privilege of conducting activities within New York.'" *Id.* (quoting *McKee Elec. Co. v. Rauland-Borg Corp.*, 20 N.Y. 2d 377, 382 (1967)).  "Purposeful activities are those with which a defendant, through volitional acts, 'avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws,'"  *Fischbarg v. Doucet*, 9 N.Y.3d 375, 380 (2007) (quoting *McKee* 20 N.Y.2d at 382).  Such acts may be contrasted with "random, fortuitous, or attenuated contacts, . . . [or] unilateral activity of another party or a third person." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985) (internal quotations omitted).

    Cases that arise from a defendant's internet activity often present perplexing questions of personal jurisdiction because, generally speaking, a website is equally accessible everywhere. Although it is "now established that one does not subject himself to the jurisdiction of the courts in another state simply because he maintains a web site which residents of that state visit," *National Football League v. Miller*, No. 99 Civ. 11846 (JSM), 2000 WL 335566 *2  (S.D.N.Y. March 30, 2000) (citing *Bensusan Restaurant Corp. v. King*, 126 F.3d 25 (2d Cir. 1997), courts have struggled to fashion a functional test to determine when a non-domiciliary's online activity constitutes the transaction of business in a particular forum.  To frame the inquiry, courts often attempt to locate the internet activity at issue on a "sliding scale of interactivity" between "passive" websites that merely make information available to interested visitors and "interactive" websites through which a defendant clearly "does business over the internet."  *Best Van Lines*, 490 F.3d at 252.  Although this analytical framework "may be useful for analyzing personal jurisdiction under Section 302(a)(1)" it "'does not amount to a separate framework for analyzing internet-based jurisdiction'" *Id.* (quoting *Best Van Lines v. Walker*, No. 03 Civ. 6585(GEL), 2004 WL 964009, *3 (S.D.N.Y. May 4, 2004)).

    In this case, locating the Hi5 website on a "spectrum of interactivity" is of limited utility because it lies in the middle of such a spectrum.  On the one hand, the Hi5 website is not wholly

passive because it does more than make information available to interested users.  *See, e.g.*
*Capitol Records, Inc.  v. MP3Tunes.com, LLC*, No. 07 Civ. 9931(WHP), 2008 WL 4450259
(S.D.N.Y. September 29, 2008) ("*MP3 Tunes*") (website is "interactive" because it permits
transfer of digital files to and from users and allows for the exchange e-mails and postings).  On
the other hand, Hi5 does not conduct *traditional* business over the internet because it neither sells
goods or services through its website nor charges membership fees to its registered users. *See Id.*
(website owner transacts business under Section 302(a)(1) by interacting with New York users,
some of which "paid for premium services"); *Warner Bros. Entm't. Inc. v. Ideal World Direct*,
516 F.Supp. 2d 261, 265 (S.D.N.Y. 2007) (transmission of digital files in exchange for
membership fees sufficient for jurisdiction under Section 302(a)(1)).

     In any event, mere interactivity is not enough to support jurisdiction under Section
302(a)(1).  The constitutional underpinnings of the New York long-arm statute and the
precedents of courts in this Circuit require something more.  *Freeplay Music, Inc. v. Cox Radio,*
*Inc.*, No. 04 Civ. 5238 (GEL), 2005 WL 1500896, *6-7 (S.D.N.Y. June 23, 2005) ("It stretches
the meaning of 'transacting business' too far to subject defendants to personal jurisdiction in any
state merely for operating a website, however commercial in nature, that is capable of reaching
customers in that state, without some evidence or allegation that commercial activity in that state
actually occurred or was actively sought."); *Chloe v. Queen Bee of Beverly Hills, LLC*, 571
F.Supp.2d. 518, 529 (S.D.N.Y. 2008) ("[I]t is more consistent with 'traditional statutory and
constitutional principles' to require some additional evidence of a defendant's 'purposeful
availment' of the forum beyond that defendant's maintenance of an interactive commercial
website.").  Although "[t]he courts consider a range of purposeful activity," *M. Shanken*
*Comm'ns. Inc. v. Cigar 500.com*, 07 Civ. 7371 (JGK), 2008 WL 2696168, *5 (S.D.N.Y. July 7,
2008) (internal quotation marks omitted), some evidence volitional activities directed at the
forum is required.

     In this case, the question of whether Hi5 uses its website to "transact business" in New
York under Section 302(a)(1) is complicated by the fact that Hi5 does not sell products or
services to its users, but rather "sells" the users' attention to advertisers.  Plaintiffs contend that
Hi5 "transacts business" in New York by providing social networking services to its New York
users (including the now-abandoned capability to upload and view video files) and by selling
online advertisements to companies (including companies based in New York) that want their
advertising message to reach New Yorkers.  Much of Hi5's interaction with its New York users,

however, lacks the traditional indicia of "purposeful availment" because it is neither volitional nor distinguishable from its interaction with users located in any other jurisdiction.  Hi5 neither advertises its website in New York nor charges membership fees to its users.[5]  The bulk of the content on the Hi5 website is created by users whose interactions with one another via the Hi5 website are registered automatically and without input from Hi5 employees.  The "sheer availability" of allegedly infringing video files on the Hi5 website is thus insufficient to support jurisdiction under Section 302(a)(1) because the video files were uploaded by unsolicited registered users acting unilaterally and were equally available to all other Hi5 users regardless of their location.  *See Realuyo v. Villa Abrille*, No. 01 Civ 9158 (JGK), 2003 WL 21537754, *6 (S.D.N.Y 2003) *aff'd* 93 Fed. Appx. 297 (2d Cir. 2004) ("sheer availability" of allegedly defamatory article on a website insufficient to support jurisdiction under Section 302(a)(1) despite 332 registered users of the website located in New York).  That at least five of the 254 allegedly infringing video files were uploaded by New York users is similarly insufficient because unilateral acts of third parties are not the kind of purposeful contacts that may properly form the basis of personal jurisdiction. *Burger King*, 471 U.S. at 475.

Furthermore, on the record before the Court, the only documented viewings of the allegedly infringing videos in New York occurred in Plaintiffs' offices.  Plaintiffs cite *Mattel, Inc. v. Adventure Apparel*, No. 00 Civ.4085 (RWS), 2001 WL 286728, at *3 (S.D.N.Y. Mar. 22, 2001), in support of their contention that these viewings alone are sufficient to support jurisdiction.  In *Mattel,* a shipment to the plaintiff's investigator of merchandise that allegedly infringed the plaintiff's trademark was deemed sufficient to support jurisdiction under Section 302(a)(1).  *Id.*; *but see Chloe*, 571 F.Supp.2d at 525-26 (sale to employee of plaintiff's law firm of product alleged to infringe plaintiff's trademark not a contact that can properly support specific jurisdiction).  Plaintiffs further contend that the sheer number of New Yorkers who visit the website combined with the hundreds of thousands of viewings of the copyrighted works warrant a strong inference that the videos were displayed in New York.[6]  But even under the

---

[5] Hi5' has at times highlighted "New York" and "Brooklyn" in a list of "Top Cities" on its website, (Mayer Decl. Ex. 1), which is evidence of efforts to serve the New York market by facilitating interaction among its *existing* users from New York, the only New Yorkers capable of viewing such a list.  This act, however, is only indirect evidence of attempts to solicit *new* registered users in New York—i.e. those who might be persuaded to use the Hi5 website because of its robust social network of New Yorkers.

[6] Plaintiffs' also argue that they should not be prejudiced by Hi5's refusal to produce information about who has viewed the allegedly infringing videos, information which is under Hi5's exclusive control.  The

reasonable assumption that New Yorkers not in Plaintiffs' employ account for *some* of the several hundred thousand viewings of the copyrighted videos, such videos were available free of charge and irrespective of the viewer's locale and thus insufficient to constitute "transaction of business" in New York.  Without evidence of something more, display of the videos on the Hi5 website is analogous to publication of the allegedly defamatory article at issue in *Realuyo,* 2003 WL 21537754, *6, which was available for free on a website that earned revenue from advertising.  There, the article was found insufficient to support jurisdiction under Section 302(a)(1) even though 332 self-identified New Yorkers had registered to received email news bulletins from the website.  *Id.*  Without more, display of the video files is distinguishable from the transmission of digital files to New York in exchange for membership fees that was found to constitute "transacting business" in *Warner Bros.,* 516 F.Supp. 2d at 265*,* and *MP3Tunes,* 2008 WL 4450259.  In short, without additional factual allegations of purposeful actions directed at New York *qua* New York, Hi5's provision of social networking services to its New York users does not constitute transaction of business under Section 302(a)(1).

However, if credited by the trier of fact, Plaintiffs' factual allegations that Hi5 sold advertisements to New York companies and sought to participate in advertising campaigns specifically directed at New York users belie purposeful availment of this forum and are thus sufficient to establish that Hi5 uses its website to "transacts business" in New York.  Documents produced in discovery show that Hi5 employees touted the company's large New York user base to potential advertisers and responded directly to advertising inquiries from New York-based companies, including companies seeking to promote recording artists.  Documents also support Plaintiffs' allegations that Hi5 either actively sought or actually consummated advertising sales transactions that targeted New York users.  If credited, these factual allegations demonstrate that Hi5 sold advertisements to New York buyers and participated in advertising campaigns that

---

Court declines to address herein the parties' disputes concerning Hi5's refusal to produce such user-identifying information, whether the technology at issue allowed video files to be "downloaded" or merely "viewed," or the significance of that distinction to copyright liability because, without further indicia of *purposeful* activities directed at this forum, the automated display or transmission of video files to New York free of charge does not constitute transaction of business in this forum. This is not to suggest that collecting revenue is the touchstone of "transact[ing] business" in New York under Section 302(a)(1).  *See Best Van Lines*, 490 F.3d at 247 n. 10 ("Section 302(a)(1)'s "transact[ing] business" language does not require that the business in question be commercial in nature.")  Rather, where a plaintiff's claim concerns products shipped to the state (or digital files transmitted here via the internet) in *exchange* for revenue the *transaction* is clear.  This is not such a case.

targeted New Yorkers.[7]  Such activities are purposeful and directed at this forum.  Consequently, these actions constitute the requisite "something more" that, when combined with the volume of Hi5's internet activity in New York, make clear that Hi5 "transacts business" in New York within the meaning of Section 302(a)(1).  Hi5 will thus be subject to personal jurisdiction under Section 302(a)(1) if the Plaintiff's claims "arise from" Hi5's transaction of business in New York.

### 2. Plaintiffs' Claims "Arise From" Hi5's New York Business Transactions.

A claim "arises from" a particular transaction "when there is some articulable nexus between the business transacted and the claim sued upon, or when there is a substantial relationship between the transaction and the claim asserted."  S*ole Resort,* 450 F.3d at 103 (internal citations and quotation marks omitted).  The Court must consider "the totality of the circumstances surrounding [the] defendants' activities in New York in connection with the matter giving rise to the lawsuit" to determine if there is "a *direct* relation between the cause of action and the in-state conduct." *Hoffritz For Cutlery, Inc. v. Amajac, Ltd.*, 763 F.2d 55, 60 (2d Cir. 1985) (citing *Fontanetta v. American Board of Internal Medicine*, 421 F.2d 355, 357 (2d Cir. 1970)).  Thus, a connection or nexus that is "'merely coincidental'" or, "at best, tangential" is insufficient to support jurisdiction."  *Sole Resort,* 450 F.3d at 104 (quoting *Johnson v. Ward*, 4 N.Y.2d 460, 467 (2005)).

Here, the gravamen of Plaintiffs' complaint is that Hi5 used video functionality and the availability of music videos on its website to generate advertising revenue and thus profited from the widespread copyright infringement that this business strategy enabled. (*See e.g.* Compl. ¶ 3 ("[Defendants] allowed infringement to go unchecked, content to profit handsomely from advertisements that appear-side-by-side with infringing content.")  Plaintiffs posit that a nexus exists between Hi5's purposeful advertising transactions and their copyright claims because Hi5

---

[7] Based upon a declaration of a Hi5 ad sales executive, Hi5 contends that the advertising campaigns targeting New York were never consummated. (Declaration of Brett Finkelstein dated February 9, 2009, at ¶¶ 6-8.)  This argument is unavailing.  First, under the applicable post-discovery standard, Plaintiff must allege facts that "*if credited by the trier*" would support jurisdiction.  *Ball*, 902 F.2d at 197. To extent that the executive's declaration contradicts a reasonable inference that may be drawn from the documentary evidence (i.e. that the advertising campaigns being discussed were implemented), it creates a credibility determination to be resolved by the trier of fact.  Second, a party may be deemed to transact business in New York if relevant commercial transactions in the forum are "actively sought."  *Freeplay Music.*, 2005 WL 1500896, *6-7. Hi5 also contends that its executives do not recall ever targeting advertisements "*exclusively* at New York users."  (Def.'s Supp. Br. at 4.) But targeting an advertisement at New York together with other regions is some evidence of "purposeful availment" of New York.

used infringing music videos as a "draw" to attract a larger audience of registered users and that the availability of popular, infringing music videos was an "integral part of Hi5's overall [advertising] strategy" that also included geographically targeted advertisements and pursuit of New York advertisers.  (Pls.' Supp. Br. at 6.)

Plaintiffs' support these allegations with documents produced in discovery that show Hi5 charged higher rates for advertisements posted to the music pages that it considered an important area of the website.  Furthermore, documents produced by Hi5 demonstrate that the companies' ad-sales team not only traded on Hi5's large user-base in New York but also used prominent recording artists as shorthand for users' demographic profiles.  Plaintiffs also allege that Hi5 "embedded" video advertisements into video files, thereby digitally integrating the revenue-producing advertisement with video content, some of which is alleged to have been copyrighted. If credited by the trier of fact, these factual allegations support the reasonable inference that Hi5 used the availability of copyrighted music videos to generate advertising revenue in New York.

Hi5 rejoins that the connection between Plaintiffs' claims and the alleged audience "draw" of music videos or advertisements sold to New York companies or purposefully aimed at New York users is too attenuated for this litigation to be deemed to arise from Hi5's purposeful contacts with New York.[8]  Hi5 points to the absence of evidence that advertisements were actually targeted exclusively to New Yorkers and contends that actual advertising tied to the 254 allegedly infringing videos identified by Plaintiffs is de minimis.  (Def.'s Supp. Br. at 4, 7-8).

But Hi5 frames the business activities that it contends are relevant to jurisdiction too narrowly.  Hi5 does not facilitate online social networking in New York or anywhere else out of sheer magnanimity.  From Hi5's perspective, a popular video represented a revenue stream that could be maximized if paired with geographically targeted advertisements for which it charged a premium.  Plaintiffs' posited connection between Hi5's advertising and Plaintiffs' copyright claims is far more than a theoretical nexus; it is a credible allegation of economic motive. Plaintiffs' submit factual allegations that show the availability of popular music videos and the ability to geographically target advertisements were integral components of an integrated

---

[8] In *Realuyo*, 2003 WL 21537754, *7, the Court reasoned that claims arising from an allegedly defamatory article on a website did not share a sufficient nexus with paid advertisements on the website to support jurisdiction.  But that case lacked any allegation that the content and the advertising were related in any way. In contrast, Plaintiffs here allege that the precise type of content at issue—i.e. copyrighted music videos of major recording artists—was a key basis for the value of the Hi5 website as an advertising venue.

advertising strategy that was itself the cornerstone of Hi5's business model.  Furthermore, New York visits to the website generated a significant amount of revenue for Hi5.

Considering the totality of Hi5's business activities in New York and assuming that Plaintiffs' factual allegations are credited by the trier of fact, Plaintiffs establish a direct relation between their cause of action and Hi5's in-state conduct that is neither tangential nor coincidental.  *See Hoffritz,* 763 F.2d at 60.  Consequently, Plaintiffs' claims "arise from" Hi5's transaction of business in New York and Hi5 is subject to personal jurisdiction in this forum pursuant to Section 302(a)(1).

### D.    New York Long-Arm Statute:  Section 302(a)(3)(ii)

Hi5 is also subject to personal jurisdiction under C.P.L.R. Section 302(a)(3)(ii).  This provision of the New York long-arm statute provides that a party is subject to personal jurisdiction in New York if he (1) "commits a tortious act without the state causing injury to person or property within the state"; (2) "expects or should reasonably expect the act to have consequences in the state"; and (3) "derives substantial revenue from interstate or international commerce."  N.Y. C.P.L.R. §302(a)(3)(ii).

Plaintiffs' allegations clearly satisfy the first and third elements of Section 302(a)(2)(ii).  Plaintiffs allege that Hi5 has tortiously infringed its copyrights by creating and maintaining video functionality on its website.  This alleged tort was committed in California where the website was created and is maintained.  *See Cable News Network, L.P., L.L.L.P. v. Gosms.com, Inc.,* No. 00 Civ. 4812 (LMM), 2000 WL 1678039, at [*]3 (S.D.N.Y. November 2, 2000); *Citigroup, Inc. v. City Holding Co.,* 97 F.Supp.2d 549, 567 (S.D.N.Y.2000)).  The alleged tort caused injury in New York because the tort of copyright infringement "cause[s] injury in the state where the allegedly infringed intellectual property is held."  *McGraw-Hill Companies, Inc. v. Ingenium Technologies Corp.*, 375 F.Supp. 2d 252, 256 (S.D.N.Y. 2005) (citing *Design Tex Group, Inc. v. U.S. Vinyl Mfg. Corp.*, No. 04 Civ. 5002 (JSR), 2005 WL 357125 *1 (S.D.N.Y. February 14, 2005).  Here, Plaintiffs are New York companies that claim to have suffered in-state injuries in the form of diminished value of their copyrights which they own here. *See Savage Universal Corp. v. Grazier Constr. Inc.*, 2004 WL 1824102, 89 (S.D.N.Y. 2004) (injury stemming from tortious infringement in New York, for the purposes of long-arm jurisdiction, can occur in the form of damage to goodwill, lost sales or lost customers); *Citigroup*, 97 F.Supp. at 568 (same).

Plaintiffs allege that Hi5 derives substantial revenue from interstate or international commerce and Hi5 does not contend otherwise.  Hi5 is a profitable corporation that employs

more than 100 people and earns revenue from the sale of internet advertising marketed to "global brands as well as national and regional advertisers."  (Mayer Decl. Ex. 9.)  A large majority of Hi5's users are foreign, and Hi5 has advertising contracts with foreign companies that pertain to advertising directed solely at non-U.S. users.

Therefore, jurisdiction is proper under Section 302(a)(3)(ii) so long as Hi5 should reasonably have expected its actions to have had consequences in New York. "'The test of whether a defendant expects or should reasonably expect his act to have consequences within the State is an objective rather than subjective one.'" *Kernan v. Kurz-Hastings, Inc.*, 175 F.3d 236, 241 (2d. Cir. 1999) (quoting *Allen v. Auto Specialties Mfg. Co.,* 45 A.D.2d 331 (3d Dep't. 1974)).  Furthermore, the "reasonable expectation" element "requires that a defendant foresee that its tortious act will have *some* consequences in New York, although not necessarily the exact consequences that occurred.  *In re DES Cases*, 789 F.Supp. 552, 570 (E.D.N.Y. 1992) (citing *Allen* 45 A.D.2d 331)).

Although courts have assumed that "[i]t is reasonably foreseeable that the provision of materials that infringe the copyrights … of a New York company will have consequences in New York," *McGraw-Hill*, 375 F.Supp. 2d at 256, New York courts apply the "reasonable expectation" requirement "in a manner consistent with United States Supreme Court precedent" in order to "avoid conflict with federal constitutional due process limits."  *Kernan v. Kurz-Hastings, Inc.*, 175 F.3d 236, 241 (2d. Cir. 1999); *see World-Wide Volkswagen* ("[T]he foreseeability that is critical to due process analysis is not the mere likelihood that a product will find its way into the forum State.  Rather, it is that the defendant's conduct and connection with the forum state are such that he should reasonably anticipate being haled into court there.")  Thus, "'foreseeability must be coupled with evidence of a purposeful New York affiliation, for example, a discernible effort to directly or indirectly serve the New York market.'" *Kernan*, 175 F.3d 241 (quoting *Schaadt v. Kutter*, 169 A.D.2d 969, 970 (3d Dep't 1991.)).  Stated differently, the foreseeability requirement is not satisfied unless there are "'tangible manifestations' showing that the nondomiciliary defendant . . . either should have known where [its product was] destined or 'was attempting to reach a New York market."  *American Network, Inc. v. Access America/Connect Atlanta, Inc.*, 975 F.Supp. 494, 498 (S.D.N.Y. 1998) (quoting *Martinez v. American Standard*, 91 A.D.2d 652, 653-54 (2d. Dep't. 1982)).

Hi5's contacts with New York evidence purposeful efforts to serve the New York market. With hundreds of thousands of registered users, New York is one of Hi5's largest domestic

markets.  As discussed above, Hi5 executives touted the company's New York user-base, communicated directly with potential New York advertisers, and expressed willingness to participate in advertising campaigns that targeted New Yorkers.  Hi5 at one time highlighted "New York City" and "Brooklyn" in a list of "Top Cities."  These actions represent "tangible manifestations" of a clear intent to reach the New York market with its "product"—i.e. social networking services paired with advertising.  *See e.g. American Network,* 975 F.Supp. at 498 (statement on website that defendant serves customers "across the U.S." and evidence of six New York customers are "tangible manifestations" of attempt to reach New York market.)

Accordingly, Plaintiffs have made factual allegations that establish a *prima facie* showing that Hi5 is subject to personal jurisdiction in this Court under Section 302(a)(3)(ii).

### E.  Due Process

Exercise of personal jurisdiction over Hi5 must also comport with constitutional due process.  This determination requires a "two-step analysis: the 'minimum contacts test' and the 'reasonableness' inquiry."  *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d 120, 127 (2d Cir. 2002) (quoting *Metropolitan Life Ins. Co. v. Robertson-Ceco Corp.,* 84 F.3d 560, 567 (2d Cir. 1996).  In cases of specific jurisdiction, "minimum contacts exist where the defendant purposefully availed itself of the privilege of doing business in the forum and could foresee being haled into court there."  *Id.* (quoting *U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co.*, 241 F.3d 135, 152 (2d Cir. 2001) (internal quotation marks omitted).

As discussed above, Hi5 engaged in purposeful activities directed at this forum, including touting its large number of New York users to potential advertisers, communicating directly with New York advertisers, and promoting social networking interactions among New York users. Hi5's purposeful efforts to serve the New York market with social networking services (including the video functionality at issue in this litigation) and advertising are sufficient to apprise the company that it should reasonably have anticipated being haled into court in New York.  *See World Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980).

Having established that Hi5 has "minimum contacts" with this forum, to avoid personal jurisdiction Hi5 "must present a compelling case that the presence of some other considerations would render jurisdiction unreasonable."  *Burger King*, 417 U.S. at 477.  Consideration of the five factors used to evaluate the reasonableness of exerting personal jurisdiction over a non-domiciliary, *Bank Brussels*, 305 F.3d at 129, reveals that Hi5 has failed to meet this burden. First, although it is likely to pose an inconvenience, litigating in this forum will not impose a

burden on Hi5 that is so unreasonable that defending against this litigation in New York would amount to a violation of Hi5's constitutional rights. Hi5 communicates with New York companies in the regular course of business and is represented by a national law firm with offices in New York. Second, this forum is home to numerous record companies forced to seek court intervention to deter online copyright infringement and thus has an interest in the adjudication of the issues raised by Plaintiffs' complaint. *See M. Shanken*, 2008 WL 2696168, *5 (stating that New York has a substantial interest in protecting the intellectual property rights of copyright owners in the state.) Third, the Plaintiffs' interest in convenient relief is served by litigating in this forum because many of them have New York as their principal place of business. Fourth, the interstate judicial system's interest in efficient resolution of this dispute would not be served by dismissing the complaint against Hi5 but not its Co-Defendant VideoEgg, which could lead Plaintiffs to file a substantially identical but separate action in California. Fifth, this Court's resolution of the instant dispute will not conflict with the "'fundamental substantive social policies' of another State" because Plaintiffs allege violations of federal copyright law and New York common law.

For the foregoing reasons, the Court's exercise of jurisdiction over Hi5 is consistent with principles of due process. Accordingly, Hi5's motion to dismiss the Complaint for lack of personal jurisdiction is DENIED.

## II.   VENUE

Hi5 also moves to dismiss the Complaint under Rule 12(b)(3) for improper venue and, in the alternative, for transfer to the Northern District of California pursuant to 28 U.S.C. §1404.

### A.  Dismissal for Improper Venue.

Hi5's argument for dismissal based on improper venue is coextensive with its personal jurisdiction argument because in a copyright case such as this one venue is proper in a judicial district where the corporate defendant is subject to personal jurisdiction at the time the action is commenced. *See AEC One Stop Group, Inc. v. CD Listening Bar, Inc*., 326 F.Supp.2d 525, 528 - 529 (S.D.N.Y. 2004); 28 U.S.C. §1400(a). Having concluded that Hi5 is subject to personal jurisdiction in this district, venue is also proper. Accordingly, Hi5's motion to dismiss the Complaint for improper venue is DENIED.

### B. Transfer to the Northern District of California.

Pursuant to 28 U.S.C. § 1404, a court may transfer a civil action to any other district where the case might have been brought if the transfer serves "the convenience of parties and witnesses,

[and is] in the interest of justice." 28 U.S.C. § 1404(a).  The burden of demonstrating the desirability of transfer lies with the moving party, and in considering the motion for transfer, a court should not disturb a plaintiff's choice of forum "unless the defendants make a clear and convincing showing that the balance of convenience favors defendants' choice." *Hubbell Inc. v. Pass & Seymour, Inc.,* 883 F.Supp. 955, 962 (S.D.N.Y. 1995).

The Court has "broad discretion in making determinations of convenience under Section 1404(a) and notions of convenience and fairness are considered on a case-by-case basis." *D.H. Blair & Co., Inc. v. Gottdiener*, 462 F.3d 95, 106 (2d Cir. 2006).  The Court must first determine whether the action could have been brought in the proposed-transferee court.  If so, the Court then must consider whether a transfer serves the "convenience of the parties and witnesses" and the "interest of justice." *Berman v. Informix Corp.,* 30 F.Supp.2d 653, 656 (S.D.N.Y. 1998).  To frame the latter inquiry, courts consider a number of factors, *Gottdiener*, 462 F.3d at 106, the application of which to this case is set forth below. "There is no rigid formula for balancing these factors and no single one of them is determinative." *Citigroup,* 97 F.Supp. 2d at 561.

### 1.  This Action Could Have Been Brought in the Proposed Transferee Forum

Both Defendants have their principal places of business in San Francisco and, as discussed above, venue in a copyright infringement case is proper in a judicial district where the defendants reside.  28 U.S.C. 1400(a).  A corporation is deemed to reside in any jurisdiction in which it is subject to personal jurisdiction, 28 U.S.C. § 1391(c), and Defendants are clearly subject to personal jurisdiction in the Northern District of California. Accordingly this action could have been brought in the proposed transferee forum.

### 2.  Convenience of Witnesses and Availability of Process to Compel Attendance of Unwilling Witnesses

"Courts typically regard the convenience of witnesses as the most important factor in considering a § 1404(a) motion to transfer." *Herbert Ltd. P'ship v. Electronic Arts Inc*.  325 F.Supp.2d 282, 286 (S.D.N.Y. 2004).  When assessing the convenience of witnesses, a court must do more than merely compare the number of witnesses who reside in the current forum to the number located in the proposed transferee forum, but should instead assess the materiality, nature and quality of the testimony that the witnesses are likely to provide.  *Id.*   Generally, "[t]he convenience of non-party witnesses is accorded more weight than that of party witnesses." *ESPN, Inc. v. Quiksilver, Inc.*, 581 F.Supp.2d 542, 547 (S.D.N.Y. 2008).

The availability of process to compel the attendance of unwilling witnesses is also relevant to a motion for transfer of venue. It is often presumed that employees of a party are available in any venue. However, several courts have interpreted Fed. R. Civ. P. 45(c)(3)(A)(ii), which directs a court to quash a subpoena that requires a person who is "neither a party nor a party's officer to travel more than 100 miles from where that persons resides, is employed, or regularly transacts business in person," to mean that non-officer employees of a party are to be considered non-party witnesses." *Herbert Ltd. P'ship*, 325 F. Supp.2d at 290 (citing cases).

The key witnesses in this case will be Hi5 officers and employees who are knowledgeable about the design, launch, and operation of the Hi5 website and Hi5's business strategy. *See AEC,* 326 F.Supp. 2d at 529 ("key witnesses" in copyright infringement case are "officers and employees who were involved in the design, production, and sale" of the allegedly infringing products.) Although it is not known how many of Hi5's likely witnesses are employees of the company as opposed to officers, Hi5 maintains that they all live and work in Northern California. (Yalamanchi Aff. ¶¶ 11, 18.)

VideoEgg's executives and employees will also likely be called as witnesses to testify about the company's technology and its partnership with Hi5. Hi5 asks the Court to draw the reasonable inference that VideoEgg's employee-witnesses are located in Northern California where VideoEgg has its principal place of business. (Def.'s Mem. at 18.) Although VideoEgg is presently a party to this litigation, its officers should not be presumed to be party witnesses for purposes Hi5's transfer motion because VideoEgg may no longer be a party at the time of trial.

Although the testimony of Plaintiffs' employees and executives who reside in New York will also be relevant, Defendants' employees are more likely to provide testimony material to the outcome of this case. Plaintiffs' employees will testify about the ownership and validity of their copyrights, their investigations of the Defendants' alleged infringement, and the damages caused thereby. (Pls.' Mem. at 22.) Testimony about the ownership or validity of the registered copyrights at issue, however, will hardly be lengthy or nuanced. Furthermore, whereas testimony about the design and creation of the technology at issue and Defendants' conduct during the period of video functionality can only come from persons who were "in the right place at the right time," the same cannot be said for testimony about Plaintiffs' ownership of the allegedly infringed copyrights which is relatively easily established and may very well be the subject of a stipulation by the time of trial. Plaintiffs' employees may also testify about injury and damages but these subjects are commonly addressed by expert witnesses, whose

convenience is not relevant to a motion to transfer venue. *Glass v. S & M NuTec, LLC*, 456 F.Supp.2d 498, 502 (S.D.N.Y. 2006)("[I]t is well settled that the location of expert witnesses is irrelevant to a transfer decision.")

In short, the bulk of material testimony on the question of liability will be provided by those responsible for the creation, design, and maintenance of the websites and technology at the center of this dispute, and these witnesses are located in California. To the extent they are employees and not officers of the Defendants, they will not be within the subpoena power of this Court. Accordingly, these factors weigh in favor of transfer.

### 3. Convenience and Relative Means of the Parties

Courts also consider the convenience of the parties, and where disparity exists between the parties, the relative means of the parties. *Berman,* 30 F.Supp.2d at 659. Hi5 describes itself as "small start up" company and with approximately 100 employees. It is certainly dwarfed by Plaintiffs who are subsidiaries of the London-based EMI Group, whose corporate parent reported 2007 annual revenues of more than $3 billion. (*See* http://www.emigroup.com/Financial).

Furthermore, three of the twelve Plaintiffs are California corporations, (Compl. ¶¶ 10, 16, 17), and eleven are registered to do business there. (Affirmation of Emma Terrell, dated July 31, 2008 ("Terrell Aff.") ¶¶ 2-13.) Moreover, as of the time this motion was filed, Capitol Records, Inc. was a plaintiff in eleven active copyrights actions in the Northern District of California and Virgin Records America, Inc. was a plaintiff in four. (*Id*. ¶14.) These facts substantially undermine Plaintiffs' claims that it would be inconvenienced by litigating this matter in California, or that transfer "would merely shift the inconveniences from one side to the other." (Pls.' Opp'n. at 22 (quoting *Sunshine Cellular v. Vanguard Cellular Systems, Inc.*, 810 F. Supp. 486, 501 (S.D.N.Y. 1992)). Accordingly, the convenience and relative means of the parties weigh in favor of transfer.

### 4. Locus of Operative Facts

"The operative facts in infringement cases usually relate to the design, development and production of an infringing product." *AEC*, 326 F.Supp.2d at 531 (S.D.N.Y. 2004) (citing *MasterCard Int'l Inc. v. Lexcel Solutions, Inc.,* 2004 WL 1368299, *6 (S.D.N.Y. 2004); *see also Cartier v. D & D Jewelry Imports*, 510 F.Supp.2d 344, 346 -347 (S.D.N.Y. 2007). The Hi5 website was designed and developed in California and the alleged partnership with VideoEgg was negotiated and implemented there. Although *injury* from copyright infringement occurs where the copyrights are owned, *McGraw-Hill*, 375 F.Supp. 2d at 256, the copyrighted works are

alleged to have been disseminated worldwide and the *operative* facts that will determine liability occurred in the proposed transferee forum.  Accordingly, this factor weighs slightly in favor of transfer.

### 5.   Location of Documents and Other Evidence

"In an era of electronic documents, easy copying and overnight shipping," the location of documents and other evidence "assumes much less importance than it did formerly." *ESPN,* 581 F.Supp.2d at 548.  Nevertheless, "in infringement cases, it makes sense that 'the  bulk of the relevant evidence usually comes from the accused infringer'" and in such cases this factor weighs in favor of transfer to "the place where the defendant's documents are kept." *Id.* at 548-49 (quoting *Millennium, L.P. v. Hyland Software, Inc.,* No. 03 Civ. 3900(DC), 2003 WL 22928644, at *4 (S.D.N.Y. Dec. 10, 2003)).  However, Hi5 has made no showing that any *particular* piece of evidence would be unduly burdensome to transport and the Plaintiffs' business records and documents are located here.  Accordingly, this factor weighs in favor of transfer, but only slightly.

### 6.   Familiarity of Forum with Applicable Law

The issue of federal copyright law is a subject on which both this Court and the proposed transferee court are familiar.  *See*, *AEC,* 326 F.Supp.2d at 531. Plaintiffs also assert common law copyright infringement claims under New York law for their pre-1972 sound recordings.  Where a plaintiff asserts state law claims, "the forum's familiarity with governing law supports retention of the action," but this factor is "one of the least important factors in determining a motion to transfer."  *ESPN*, 581 F.Supp.2d at 550-551 (internal quotations and citations omitted). Accordingly, this factor weighs slightly, but not substantially, against transfer.

### 7. Plaintiff's Choice of Forum

"A plaintiff's choice of forum generally is entitled considerable weight—particularly when the plaintiff is a resident of the forum district—and should not be disturbed unless the balance of several factors is strongly in favor of defendant."  *Fuji Photo Film Co., Ltd. v. Lexar Media, Inc*., 415 F.Supp.2d 370, 376 (S.D.N.Y. 2006).  "However, the emphasis placed by a court on this choice diminishes where 'the operative facts upon which the litigation is brought bear little material connection to the chosen forum.'" *Berman,* 30 F.Supp.2d at 659 (quoting *Nieves v. American Airlines*, 700 F.Supp. 769, 772 (S.D.N.Y. 1988).  Although most of the Plaintiffs are based in New York and this case has sufficient connection with this forum to support personal jurisdiction over Hi5, the bulk of the events that give rise to this action occurred

in Northern California and some of the Plaintiffs have chosen to initiate several recent actions in
that district. Consequently, the Court affords Plaintiffs' choice of forum less emphasis here.

In summary, Hi5 has made the requisite clear and convincing showing that transfer of
this action will serve the convenience of the parties and the interests of justice. Accordingly,
Hi5's motion to transfer this case to the Northern District of California is GRANTED.

## CONCLUSION

For the foregoing reasons, Hi5's motions to dismiss the Complaint for lack of personal
jurisdiction and improper venue are DENIED. Hi5's motion to transfer this action to the
Northern District of California is GRANTED.

**SO ORDERED**
**New York, New York**
**March ⁤  , 2009**                              **U.S.D.J.**

19